**INDIAN TOWING COMPANY, Inc., and River Service Corporation, Libelants,**

v.

**TUG WESLEY W, etc. and Dixie Carriers, Inc., Respondents.**

**No. 5941.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 2, 1967.

⟐98

L. Howard McCurdy, Jr., Donald L. King, New Orleans, La., for libelants.

Francis Emmett, New Orleans, La., for respondents.

RUBIN, District Judge:

The tows of the M/V CHANDELEUR and of the M/V WESLEY W collided while proceeding in opposite directions in the Gulf Intracoastal Waterway near Mile 121, west of Harvey, on June 29, 1962, at about 6:00 o'clock A.M. when light and visibility were good.

The owner of the M/V CHANDELEUR and the owner of the barges she was towing seek to recover their respective damages. The owner of the WESLEY W flotilla seeks by cross suit to recover its damages and impleads the owners of the CHANDELEUR for the damages claimed for the barges in the WESLEY W's flotilla.

While the time and date of the accident and the position of the tows on impact are clear, and the amount of damages sustained by each of the parties is relatively easy to ascertain, the accounts of the collision given by the witnesses differ radically. Part of this may result from the differences in observation points occupied by the various witnesses, part of it may result from the four-year lapse of time between the date of the accident and the date of trial, and part of it may result from the inborn frailty of the powers of human observation and recollection. But when all had been said, the Court concluded that the more credible account of what happened is as follows:

## FACTS

The CHANDELEUR was eastbound pushing four loaded barges, a tow about 850 feet long. It had just left Mud Lake and was approaching a right hand (south bank) bend. Its speed was about four miles per hour. The WESLEY W was westbound pushing two empty barges at a speed of seven to eight miles per hour. As the WESLEY W approached the bend at Mile 121, her master blew a one-blast whistle signal for a port-to-port passing. The master of the WESLEY W could see the CHANDELEUR approaching before either tug reached the bend because visibility was good, and the light of the wheel house permitted clear visibility across the south bank of the canal which was at this point relatively free of spoil banks and trees. The master of the CHANDELEUR should have been able to see the WESLEY W, although he said he didn't and denied that he could have, claiming that the trees there were so thick and high as to render the point blind to man and blank to radar.

The flotillas approached the bend and closed on each other. As the head of the CHANDELEUR's tow emerged from the point of the bend, the master of the WESLEY W could see that water was shooting up from the CHANDELEUR's rudder. This "rooster-tail" indicated to

the WESLEY W's master that the CHANDELEUR had caught a suction on the bank,[1] and he sounded the four whistle blast danger signal, slowed his tug, and reversed his engines. A moment thereafter the master of the CHANDELEUR noticed the peril of collision, sounded the danger signal, and placed his engines on full reverse. The steps taken were insufficient to avert the hazard, and the collision nonetheless ensued. The WESLEY W stopped its tow before impact by grounding in the trees on the right hand bank of the waterway. Thereafter the CHANDELEUR's lead barge struck the side of the WESLEY W's tow. On impact the WESLEY W's tow was stopped aground amid the trees on the north bank. The CHANDELEUR and her tow were stretched almost from one side of the waterway to the other.

The waterway in the vicinity was natural, and was about 300 feet wide. The bend was an easy one and the vessels could have passed each other in it side by side.

This version of the events differs markedly from the account given by the master of the CHANDELEUR. However, on those points on which his testimony could be checked, it appeared to be either confused or wrong. He thought the channel was only 125 feet wide at Mile 121, and that the waterway was only 150 feet wide. The charts indicate that the waterway was twice that wide. He testified that from Mile 121 to Mile 123 there were several sharp bends in the channel. The chart indicates only easy bends. He thought visibility on the south bank was obscured by high trees and

spoil. The charts indicate the presence of neither. He testified he heard no one-blast signal from the WESLEY W but he said in the statement he gave the Coast Guard shortly after the accident that "A second before I blew the danger signal the approaching tug had blown 1 blast of his whistle. * * *" These matters, taken together with the other testimony, and the impression made by the various witnesses, leads me to believe that the account of the events leading to the collision given by the master of the CHANDELEUR is not accurate.

Having determined that the facts are as set forth above, I conclude that the collision was caused by the fault of the CHANDELEUR, and that the faults of the WESLEY W, if any were committed, were so minor when compared to those of the CHANDELEUR that the CHANDELEUR should be assessed with sole fault.

## NARROW CHANNEL RULE

The Inland Rules of the Road govern navigation on the Gulf Intracoastal Waterway.[2] Article 25 of these rules provides that, "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."[3]

The CHANDELEUR was unable to bring its tow to a stop before the collision or to keep it on the south bank side of the mid-channel. This may have been caused in part by the lack of power testified to by her master and by the fact that she had a single propeller with a left hand screw in addition to the other factors mentioned in the findings of fact.

1. See, Plummer's Shiphandling in Narrow Channels (1945) pp. 7, 8. "When making a gradual bend in a narrow channel, he (the pilot) will almost invariably do the natural thing, which is to begin swinging a little too soon, with the result that the ship will feel the effect of suction from the point. This will cause her to require besides the amount of rudder normally necessary to make such a swing, whatever additional amount is necessary to counteract the retarding effect of the suction from the point. * * * If he (the pilot) is not suction conscious, the one in charge is almost certain to have a feeling of satisfaction that, by swinging early, he is taking a little extra precaution. But the ironical fact is this: The more cautious he intends to be, the more danger he is putting his ship because when making a turn in this manner, to have a little stronger head tide or a little heavier wind might cause the ship to fail to answer, even with full rudder." The CHANDELEUR had a head tide.

2. 33 U.S.C.A. § 154.

3. 33 U.S.C.A. § 210.

At any rate it is clear that the CHANDELEUR's tow wound up being where it should not have been.

■ Violation of the narrow channel rule "is, of course, a statutory fault, rendering the offending vessel liable, unless it is shown that the fault did not contribute." [4]

■ It was incumbent upon respondent "to sustain the burden of showing not merely that her fault might not have been one of the causes of the accident, but that such violation could not have contributed to the collision." [5]

"The Narrow Channel Rule is of peculiar importance because of the danger incident to passing in narrow waters and because of the especial need that each vessel may be able to rely on the other's obedience to the rule." [6]

■ The WESLEY W was entitled to presume that the CHANDELEUR would keep to her own side. [7]

LOOKOUT—MEETING SIGNALS

■ The waterway in the area of the collision was 300 feet wide. Despite the bends in the channel, the masters of each vessel could see approaching tugs for some distance because of the flat terrain, the absence of trees, and the height of the wheel-house of each tug. Neither vessel maintained a proper lookout, but the WESLEY W did see the CHANDELEUR approaching when it was a half mile away. The WESLEY W did sound a passing signal. The CHANDELEUR did not. The master of the CHANDELEUR testified he attempted to give a bend warning by radio, but there is no evidence other than his own account that he did. Even if he did, this does not absolve him of fault for failing to sound a proper signal.

In fact, there appears to have been no reason to sound a bend signal. "The purpose of the bend signal is, obviously, to prevent vessels from encountering each other unexpectedly and at close quarters in rounding a point. * * * " [8] Here the point permitted clear visibility, and there is no need for the bend signal when the character of the bend is such that the vessels can see each other continuously from the time they are a half a mile apart. [9] The appropriate signal was the passing signal which was given by the WESLEY W, but admittedly not by the CHANDELEUR.

■ If the navigator on the CHANDELEUR did not see the WESLEY W flotilla until the vessels were in danger of collision, then the CHANDELEUR was guilty both of maintaining an improper lookout, another statutory fault, [10] and of failure to give a proper passing signal. [11] The duty on the CHANDE-

---

4. Griffin, On Collision, § 36, p. 89.

5. Lee v. Candies, E.D.La.1963, 216 F.Supp. 665, 666, aff'd 5th Cir. 1963, 323 F.2d 363. This is the doctrine of The Pennsylvania, 19 Wall. (86 U.S.) 125, 136, 22 L.Ed. 148 (1873). "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

6. Griffin, On Collision, § 36, p. 89.

7. The Victory (The Plymothian), 168 U.S. 410, 426, 18 S.Ct. 149, 156, 42 L.Ed. 519, 529 (1897). See also The Bilbster, 2d Cir. 1925, 6 F.2d 954.

8. Griffin, On Collision, § 81, p. 226.

9. Article 18, Rule V, Inland Rules, 33 U.S. C.A. § 203, Rule V.

10. Article 29, 33 U.S.C.A. § 221:
"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of any neglect to keep a proper lookout * * *."

11. Article 18, Rule I, 33 U.S.C.A. § 203:
"When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short distinct blast of her whistle, which the other vessel shall answer promptly * * *."

LEUR to give a passing signal was especially strict since her intention was to pass in other than the normal way.[12]

## MAJOR-MINOR FAULT

■ The proximate cause of the collision was the failure of the CHANDELEUR to keep to her side of the fairway, coupled with her failure to maintain a proper lookout, and her failure to heed the passing signal given by the WESLEY W. Whether as the result of inattention on the part of her pilot, a suction on the bank, her single left hand propeller, or a lack of power sufficient to handle her tow properly, the CHANDELEUR was unable to keep to her side of the channel. Under these circumstances, the WESLEY W was not at fault for continuing ahead on her own right-hand side of the canal after sounding a signal proposing a port-to-port passing. She had a right to assume that the CHANDELEUR "would obey the law and make the required port-to-port passing in the narrow channel."[13]

Fault is sought to be found with the WESLEY W in proceeding at a speed excessive under the circumstances, in failing to give a bend signal, in failing to maintain a proper lookout, and in thus contributing to the accident. The evidence does not support the thesis that the speed of the tug was excessive or that the WESLEY W failed to give a signal. The failure to maintain a lookout at the head of the flotilla does not appear to have contributed materially to the collision because the master of the WESLEY W could himself see the CHANDELEUR when it was half a mile away. A lookout would have discovered the peril of collision no sooner than the master.

■ ■ Although it is argued that the WESLEY W waited until collision was inevitable before she sounded the danger signal and reversed, it is clear that she sounded as soon as the danger was clear. Her failure to signal danger sooner was at best therefore a minor omission, and her fault in this regard was not a contributory cause of the collision. "The gross negligence of [the other vessel] clearly appearing as the proximate cause of the collision, it is not required that the conduct of [the vessel bearing minor fault] be scrutinized narrowly for fault."[14]

■ "The principle is well established that where one vessel, clearly shown to have been guilty of fault adequate in itself to account for the collision, seeks to impugn the management of other vessels, there is a presumption in favor of the latter which can only be rebutted by clear proof of contributive fault."[15]

## DAMAGES

Dixie Carriers claims damages in the amount of $10,298.43 as a result of this collision as shown below.

| | |
|---|---:|
| Repair of Barge PTT 301 | $ 4,739.93 |
| Repair of Barge PTT 302 | 2,110.90 |
| Towage to repair yard | 185.60 |
| Loss of use of barges and WESLEY W | 3,262.00 |
| Total | $10,298.43 |

There was no serious dispute with respect to the amount of this claim, and decree is entered in this amount with interest from the date of decree.

12. Griffin, On Collision, § 67, p. 199.

13. Pure Oil Company v. Jack Neilson, Inc., E.D.La.1955, 135 F.Supp. 786, affirmed 5th Cir. 1956, 233 F.2d 790.

14. Ibid. See also The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, 90; The Coastwise, 2d Cir. 1934, 68 F.2d 720. "If a whistle signal is blown and is ignored by the other vessel, it is commonly held proper for the first vessel to repeat her signal before resorting to other measures, unless the situation is such that to do so would invoke danger." Griffin, on Collision, § 72, p. 207.

15. Cia De Maderas De Caibarien, S. A. v. The Queenston Heights, E.D.La.1954, 121 F.Supp. 280, affirmed 5th Cir. 1955, 220 F.2d 120; The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Victory, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519.