PENROD DRILLING COMPANY, et al.

v.

INLAND OIL & TRANSPORT
COMPANY, et al.

Civ. A. No. 81–2720.

United States District Court,
E.D. Louisiana.

March 23, 1983.

---

Hebert & Abbott, Dean A. Sutherland, T.A., S. Daniel Meeks, New Orleans, La., for plaintiffs.

Timothy Shane O'Neill, Scott R. Wheaton, Jr., Lugenbuhl, Larzelere & Ellefson, New Orleans, La., for Inland Oil & Transport Co., & M/V Lady Marjorie & Barge 1OT–1.

## OPINION

ARCENEAUX, District Judge.

Plaintiffs, Penrod Drilling Company ("Penrod") and Petrol Marine Company ("Petrol"), as owner and operator respectively, of the M/V WATERBUCK, instituted this suit in admiralty against Inland Oil and Transport Company ("Inland"), as owner and operator of the M/V LADY MARJORIE, for damages arising from a collision between plaintiff's vessel and the tow of the M/V LADY MARJORIE on the Gulf Intracoastal Waterway near the 60 Mile Bend in Houma, Louisiana. The M/V LADY MARJORIE counterclaimed for damages allegedly sustained in the collision.

A trial on liability was held on September 24, 1982, before the Court without a jury; upon consent of counsel, the issue of damages was severed to be tried, if necessary, before the Magistrate. Upon completion of trial, the matter was taken under submission. Having thoroughly reviewed the evidence,[1] memoranda of counsel and the law, the Court now issues its opinion.

## FINDINGS

Certain facts remain uncontroverted by the evidence adduced at trial. On February 5, 1981, the M/V LADY MARJORIE, a steel hull push boat approximately 145 feet in length, was pushing a 1008–foot tow of four loaded barges, 10T–108, 10T–451, 10T–175 and 10T–113, westerly in the Intracoastal Waterway. At the same time, the M/V WATERBUCK, a steel hull work boat measuring 38 feet by 155 feet, was eastbound in the Intracoastal Waterway, immediately preceded by the M/V FRANCIS DRAKE and her tow. Both the M/V LADY MARJORIE and the M/V WATERBUCK were being piloted by licensed captains, fully equipped with operational whistles, lights and radio equipment. Neither had posted a lookout at the time the collision occurred.

Although it was dark at 7:00 p.m. as these three vessels approached the Mile 60 Bend in Houma, Louisiana on their respective courses, visibility was good. The bend opens up to the northern bank of the Intracoastal Waterway; its relative vertex on

---

1. The Court notes that in post trial memoranda counsel have occasionally referred the Court to deposition testimony not offered into evidence. Of course, the Court cannot consider any testimony not designated as evidence.

the southern bank is approximately 1600 feet west of the Bayou DuLarge Bridge. The exact width of the Waterway at the collision site was not statistically shown at trial; one witness estimated a 400 foot span between banks with complete navigability and at least one other witness testified to only a 120 foot navigational channel. The Court has relied upon the maps of the area (Exh. P–1; Exh. D–2) and upon the witnesses' use of the maps in explaining the positions of their vessels at pertinent times in finding the width of the Waterway at the collision site to be approximately 400 feet with a navigational span approximately the same for relevant purposes.

As the M/V LADY MARJORIE and her tow neared the bridge, her captain, William Horsley, radioed the bridge to open. Further radio contact with the M/V FRANCIS DRAKE confirmed a one-whistle (port-to-port) passage with the agreement that the M/V FRANCIS DRAKE would "hold up" on the starboard side of the channel approximately 300 feet west of the bridge until the M/V LADY MARJORIE cleared the bridge. Due to this arrangement, the M/V LADY MARJORIE had to wait until her stern passed the M/V FRANCIS DRAKE before she could begin her "swing" through the bend.

Meanwhile, the M/V WATERBUCK had been proceeding toward the bend. Although her intention, position, and direction in the Waterway is disputed, it is clear that no passing agreement was reached between the M/V WATERBUCK and the M/V LADY MARJORIE in the bend. Likewise, it is clear that a collision occurred near the southern bank on the bend between the port side of the M/V WATERBUCK and the wake of the lead barge of the tow as the M/V LADY MARJORIE was maneuvering her swing.

According to the testimony of Homer Hardin, the captain of the M/V WATERBUCK, he overheard the M/V LADY MARJORIE's communication with the bridge and the M/V FRANCIS DRAKE. He attempted to call the M/V LADY MARJORIE, received no response, and later blew one whistle signifying a port-to-port passage, which also remained unanswered. Unsure of the M/V LADY MARJORIE's intention, and aware that the M/V FRANCIS DRAKE had held up, Captain Hardin testified that he also "held up" west of the bend, thirty feet off the southern bank and east of some moored barges, as the M/V LADY MARJORIE cleared the bridge. The M/V WATERBUCK remained drifting in this position even as the M/V FRANCIS DRAKE moved up. Captain Hardin testified that he never went on the port side of the channel during this time and never moved the M/V WATERBUCK more than thirty feet away from the southern bank while held up. Upon seeing the M/V LADY MARJORIE's late start on her swing in the bend, and eventually recognizing the danger of collision, Captain Hardin finally moved the M/V WATERBUCK against the bank moments before the collision. No emergency whistles were blown by Captain Hardin because he was busy maneuvering the M/V WATERBUCK against the bank; he further testified that any warning would have been futile since collision was unavoidable.

As is common in collision cases, those aboard the M/V LADY MARJORIE recalled a different version of the critical minutes before the collision. The three witnesses who testified were all in the pilothouse of the M/V LADY MARJORIE at the time of the collision.

Edward Warwick, a deckhand on a coffee break in the pilothouse at relevant times, testified in deposition that he heard the M/V WATERBUCK sign off on the radio as the M/V LADY MARJORIE was coming through the bridge, and heard Captain Horsley try to get her back on the radio. The chief engineer, Larry McReynolds, testified that he did not hear the M/V WATERBUCK on the radio, but that he did hear Captain Horsley check for traffic on the radio after the M/V LADY MARJORIE cleared communication with the M/V FRANCIS DRAKE and thereafter; he saw Captain Horsley toss the microphone on the deck when he began backing his engines.

Captain Horsley testified that he did check for traffic at the 60 Mile Bend, with no response.

The crew also testified that they did not hear any whistles from the M/V WATERBUCK. However, Warwick and McReynolds both testified that they also did not hear whistles from the M/V FRANCIS DRAKE; McReynolds could not hear the M/V LADY MARJORIE's own blasts. Warwick explained that the pilothouse was effectively soundproofed when, as at the time under examination, the windows and doors were closed; Warwick testified that, under such circumstances, he relied upon lights coordinated with the blasts in order to understand a vessel's message.

These crew members further testified that they viewed the collision from the pilothouse, elevated 35–40 feet above the water. Warwick testified that he first saw the M/V WATERBUCK come around the bend as the tow started breaking into the bend; for a while, he could not tell if the M/V WATERBUCK was moving or stationary. Warwick thought that the M/V WATERBUCK was going to pass the M/V LADY MARJORIE on her two-whistle (starboard) side; he further testified that, instead, the M/V WATERBUCK cut across in front of the M/V LADY MARJORIE on her port side about two to three minutes after first being spotted. Warwick testified that he could only tell the M/V WATERBUCK's exact location in the channel when they were in a direct line, and that he found it impossible to judge same from around the bend in the darkness. McReynolds testified that, prior to the collision, he was looking out the back of the pilothouse; when he felt the collision, he turned to see the M/V WATERBUCK "come out" from the M/V LADY MARJORIE's tow on her port side.

While Captain Horsley also testified that he thought at first that the M/V WATERBUCK was going to pass on the two-whistle side, and that he saw the M/V WATERBUCK speed up and cross the M/V LADY MARJORIE's bow, his testimony, although somewhat adamantly delivered, has been problematic for the Court. He testified that he first saw the M/V WATERBUCK when his lead tow was 25–30 feet off the southern bank, after he had begun to swing the tow and just after he had turned back for 15–20 seconds to ascertain the M/V FRANCIS DRAKE's passing position. Within two minutes, the M/V WATERBUCK had made her move from the center of the waterway to the southern bank. He reversed his engines when he saw the M/V WATERBUCK cut in front from the center of the channel to the southern bank. In any event, Captain Horsley testified that the M/V WATERBUCK was not moving when the vessels collided, and only upon cross examination realized that the M/V WATERBUCK's 38 foot width necessitated that she have squeezed in between the tow's port and onto the bank.[2]

Additionally, it appears from the testimony of Captain Horsley that the decision not to post a lookout when the personnel was available was deliberately made, due to his belief that one was not necessary. However, he admitted that a lookout would have been able to see the M/V WATERBUCK sooner. He also admitted that he was preoccupied and doing many things at once during this maneuver.

This Court accepts the testimony presented by the various witnesses to the extent that they merge. It specifically finds that radio communication was attempted by both vessels, that the M/V WATERBUCK was heard on the M/V LADY MARJORIE's

---

**2.** The only other testimony on this point came from the deposition of McReynolds:

"... and I looked up and saw this work boat come out from our tow on the port side. And after all this settled down, the work boat lost an engine and they wallowed around on the bank up there between the tow and the port side where they was up in shallow water. And they got wallowed around there and finally got off the ground and got over next to our tow and tied off." (Depo., p. 11, l. 19—p. 12, l. 2) This Court finds that this testimony indicates that the M/V WATERBUCK remained in the water near the bank until she lost an engine and began to wallow in the shallow water. More importantly it contradicts this alternative theory of the collision proposed by Captain Horsley on cross examination.

radio, and that only the M/V WATER-BUCK whistled. However, this Court discredits the testimony of those aboard the M/V LADY MARJORIE in her pilothouse as it relates to the circumstances surrounding the actual collision at the end of her 1008 foot tow, as she was breaking into the bend in the darkness, aided only by search lights.

The Court notes that the captain of the M/V LADY MARJORIE was busy maneuvering a late swing into the bend, and that even looking back at the M/V FRANCIS DRAKE as she entered the bend. While the deckhand testified that he observed the collision, he was on a coffee break at the time and indicated that visibility around the bend was not clear enough to adequately gauge the relative location of the M/V WATERBUCK in the bend. When coupled with the captain's infeasible statement that the M/V WATERBUCK darted across the bow of the M/V LADY MARJORIE and squeezed into a space between the tow and the bank substantially less than the width of the work boat, the Court necessarily finds that the visibility from the pilothouse was, at best, impaired.

The captain of the M/V WATERBUCK, however, was able to observe the physical circumstances leading up to the collision much sooner and, this Court specifically finds, with greater accuracy. Therefore, the Court finds that a preponderance of the credible evidence proves that the M/V WATERBUCK was held up as the M/V LADY MARJORIE entered into the bend as established in the testimony of Captain Hardin. To the extent that his version of those critical circumstances surrounding the collision differs from the versions adduced in testimony by crew members of the M/V LADY MARJORIE, Captain Hardin's testimony is accepted by the Court.

## CONCLUSIONS

The Court concludes that the M/V LADY MARJORIE was negligent in various aspects and that her negligence caused the collision. Initially the Court concludes that her failure to post a lookout on the end of her 1008 foot tow during the approach to and negotiation of the bend constitutes extreme negligence under the circumstances presented. Having found that she did attempt to radio oncoming traffic, the Court concludes that her failure to make arrangements to hear whistle signals in her soundproof pilothouse, her late swing in the bend pushing the lead barge close to the southern bank, and her captain's preoccupation with the M/V FRANCIS DRAKE's position behind him at critical moments during the negotiation of the bend, although perhaps individually considered as justified by the M/V LADY MARJORIE at the time, actually compound her negligence in failing to post a lookout.

Further, the Court concludes that the M/V LADY MARJORIE was negligent in causing the collision by proceeding on the port side of the channel in the bend, with no passing agreement with oncoming traffic. One crew member testified that he heard the M/V WATERBUCK on the radio, and even though Captain Horsley attempted radio contact as his tow was entering the bend, he assumed that passage with any oncoming vessels would be safe and, upon spotting the M/V WATERBUCK, further assumed that a starboard-to-starboard passage would be undertaken without initiating or listening for whistle signals. The Court believes that such assumptions were erroneously and faultily made in light of the circumstances.

The failure of the M/V LADY MARJORIE to post a lookout, and her navigation on the port side of the waterway, both constitute statutory violations. 33 U.S.C. § 221; 33 U.S.C. § 203; 33 U.S.C. § 210. This invokes the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). In order for a vessel cast in fault under The Pennsylvania to escape liability, it must show that the statutory violation could not have contributed to causing the accident. Gilmore & Black, The Law of Admiralty, 494–498 (2d Ed.1975). The Fifth Circuit has held that this statutory fault must be a contributory and proximate cause of the collision and not merely fault in the abstract. Board of Commissioners of the Port of New Orleans v. M/V Farmsum, 574 F.2d 289 (5th Cir.1978). The Court does

not hesitate to find that the M/V LADY MARJORIE has not only failed to rebut this presumption, but that the evidence presented unaided by any presumption clearly establishes her negligence. Captain Horsley himself testified that a lookout posted at the end of the tow could have spotted the M/V WATERBUCK sooner; this Court believes that an accurate appraisal of the M/V WATERBUCK's position could have been made, her whistle signal heard, and appropriate evasive action could have been taken sooner, thereby avoiding the collision. *The New York,* 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899).

 Likewise the statutory violation of 33 U.S.C. § 203 and 33 U.S.C. § 210 gives rise to a presumption against the violator.[3] Presumptively, it is safe and practicable to navigate on the starboard side of the channel. Griffin, *The American Law of Collision,* 96 (1949). The burden of proof is on the vessel found on the wrong side of the channel to show not merely that her fault might not have been one of the causes of the accident, but that such violation could not have contributed to the collision. *Lee v. Candies,* 216 F.Supp. 665 (E.D.La.1963), aff'd 323 F.2d 363 (5th Cir.1963). The defendant has failed to rebut this presumption as well; the evidence itself clearly shows that the M/V LADY MARJORIE's disregard of this rule contributed to the accident, while compounding the degree of her fault in the collision.

 On the other hand, the Court does not believe that the M/V WATERBUCK was negligent nor that she could have taken any more evasive action than she did. Her captain spotted the M/V LADY MARJO-RIE early, as she was passing through the bridge.[4] Aware of the passing agreement between the M/V LADY MARJORIE and the M/V FRANCIS DRAKE, he attempted radio contact, and, upon receiving no reply, immediately held up just beyond some moored barges, blew one whistle, and finally moved his vessel against the bank in an attempt to avoid collision.[5]

 In addition, the Court holds that he was placed in an emergency position through the improper navigation of M/V LADY MARJORIE's tow. In such a case, where her master exercises his best judgment in an emergency not created or contributed to by him, the M/V WATERBUCK discharged all obligations and did not violate any of the Inland Rules. See: *John I. Hay Co., supra.* Finally, the Court does not believe that Captain Hardin's lack of familiarity with the Intracoastal Waterway in any way affected his judgment detrimentally. See: *The Carl Gustaf,* 53 F. 846 (5th Cir.1892).

In conclusion, the Court holds that the collision was solely caused by the failure of the M/V LADY MARJORIE to post a proper lookout, as compounded by the circumstances indicating a lack of prudence and caution in her negotiation of the bend, and her failure to keep to the starboard side of the waterway, absent a passing agreement to the contrary. Accordingly,

IT IS ORDERED that judgment will be entered in favor of plaintiffs and against defendants, after the issue of damages has been resolved, either amicably or after a hearing before the Magistrate.

3. It has been held that the Inland Rules, including this Narrow Channel Rule, applies to the Gulf Intracoastal Waterway. *Indian Towing Co., Inc. v. Tug Wesley W,* 264 F.Supp. 892 (E.D.La.1967); *John I. Hay Co. v. The M/V Dorothy I Southern,* 221 F.Supp. 538 (E.D.La. 1963), aff'd 334 F.2d 376 (5th Cir.1964). The Narrow Channel Rule provides that vessels "when it is safe as practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel". This rule applies in bends. *The Victory,* 168 U.S. 410, 418, 18 S.Ct. 149, 153, 42 L.Ed. 519 (1896); *The Belleville,* 92 F.2d 433 (2d Cir.1937).

4. The Court does not believe that a lookout would have aided the M/V WATERBUCK in this regard.

5. "Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty". *The New York, supra* 175 U.S. at 201, 20 S.Ct. at 72.