## THE CERES.
## THE MOHAWK.
### THE FRANCIS J. REICHERT.

### C. F. HARMS CO. v. NEW ENGLAND S. S. CO.
#### Nos. 101–398.

District Court, S. D. New York.
Nov. 11, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (Carl Vander Clute, of New York City, of counsel), for libelant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James Mc-Kown, Jr., both of New York City, of counsel), for the Mohawk.

Duncan & Mount, of New York City (Henry W. Dieck, Jr., and Charles R. Millett, both of New York City, of counsel), for the Francis J. Reichert.

WOOLSEY, District Judge.

Neither the deck scow Ceres nor the tug Francis J. Reichert was in fault for the collision hereinafter discussed, for which I hold the steamship Mohawk solely to blame.

I. On Saturday, April 13, 1929, about 4:45 p. m., the steamship Mohawk, eastward bound from Pier 40, North River, to New Haven, Conn., and the deck scow Ceres, in tow of the tug Francis J. Reichert, hereinafter called the Reichert, bound from Whitestone, Long Island, to Jersey City, came into collision in Hell Gate.

This collision was one of those hurried affairs, too common in our local waters, in which the story told by the navigators of the respective vessels is to a large extent in almost hopeless conflict, and of which the true solution cannot be found in the evidence from the respective vessels but must be worked out against such background of probabilities as the Court can reconstruct from the master facts.

II. Here fortunately we find some common ground between the parties.

In the first place, the place of the collision is fixed at approximately the same point by the captain of the tug and the captain of the Mohawk, namely, at a point about N. E. by N. of Hallet's Point Light, and about 250 yards therefrom.

It is also common ground between the parties that the visibility was good and that the easterly wind played no part in the collision, except in so far as it may have affected the audibility of the bend whistles, which I find each vessel blew, or may have accelerated the ebb tide which admittedly was running at the time of the collision in full strength of from four to four and a half miles per hour.

That is a strong current, and a tug and tow coming down with it in such narrow waters must necessarily navigate with circumspection to avoid disaster, and has to be treated with consideration by more manageable vessels.

The length of the Mohawk was about 350 feet. This was substantially the same as the total length of the tow, for the Reichert was about 100 feet long, the scow Ceres was about 120 feet long, and they were joined by a double tow line about 150 feet in length. A single vessel like the Mohawk is, however, obviously much easier to maneuver than any tandem tow.

The navigators of both vessels were most experienced and have spent most of their water life in passing back and forth through Hell Gate. If any one is able to foresee its eccentricities, it is such men as they were. But it must be remembered that familiarity often breeds disregard of precautions which would be observed by those who are less experienced.

III. Neither vessel heard the bend whistle of the other, possibly as above suggested owing to the brisk easterly wind, but the Reichert, according to her master's evidence, saw the superstructure of the Mohawk when the latter was well below Hallet's Point Light and knew that she was going up against the tide

and judged that she was well on the Astoria side of mid-channel.

It is common ground between the parties that along the Astoria shore there is a flood eddy at ebb tide, which starts a little above the Astoria Ferry slips, runs parallel to the shore almost up to Hallet's Point, and has a width of about 150 feet from the Astoria shore.

The Mohawk claims to have been in the full ebb tide and outside of this flood eddy. This may well be true and still allow her to be well to the eastward of mid-channel.

The impression left on me by the Mohawk's witnesses was that they were such old hands in dealing with easily manoeuvred vessels that they went on past Hallet's Point with undiminished speed, about ten knots over the ground, counting on being able to get by the tow without slackening of the speed of their vessel, and that having done so they colored their evidence to justify themselves.

The Mohawk claims that when she was below the Park off Hallet's Point she observed the Reichert to the right of, and consequently to the eastward of, Hallet's Point Light. This may have been true, but would not necessarily put the Reichert on the wrong side of the channel or far into Pot Cove.

When she thus observed the Reichert, I think that the Mohawk, being admittedly able to hold herself in the current, should have stopped and waited until the situation developed. Such a pause on her part would be in accordance with the Hell Gate custom for an east-bound vessel on ebb tide. Failure thus to stop has been held a fault even when the bend whistle of a west-bound vessel coming down on the ebb has not been heard, and, by implication, her presence is not known. The New Hampshire, 225 F. 363, 364 (C. C. A. 2). But here the Mohawk saw the Reichert and her tow in time to have taken seasonable measures of safety.

The position of the Mohawk when she sighted the Reichert across Hallet's Point Park was about 600 feet, or approximately two ship lengths below Hallet's Point.

The Reichert's speed over the ground with the tide was about seven miles per hour—practically a minimum for steerage way—and the Mohawk's speed against the tide was about ten miles over the ground.

The two vessels were then probably somewhere between a quarter and a half mile—say about 2,000 feet—apart, and were approaching each other, due to their respective speeds,

at the rate, roughly, of about 1,700 feet per minute. Thus there was not much time for aught but the most conventional maneuvers.

The situation was not a crossing situation but a situation of vessels meeting on a bend. Cf. The Victory and The Plymothian, 168 U. S. 410, 418, 18 S. Ct. 149, 42 L. Ed. 519.

The Mohawk claims that she blew a two blast signal to initiate a starboard to starboard passing, and that she was justified in doing so owing to the relative positions of the vessels. I doubt whether she blew this signal. In any event, it was not heard by the Reichert as a two-blast signal.

The Reichert understood that the Mohawk had blown her a single blast signal, and at once replied with one blast. It is possible that her own whistle synchronized with the second whistle from the Mohawk. But, however that may be, I think the Mohawk's suggestion of a starboard to starboard passage would not have been justified under the circumstances, and that the single blast signal which the Reichert understood her to blow was a proper signal and was properly answered by the Reichert.

The Mohawk, as above stated, did not wait below Hallet's Point for the Reichert and her tow to get around the bend and straighten down the river, but instead proceeded ahead at ten knots over the ground and endeavored to round Hallet's Point.

It is well known to navigators of that difficult channel that the ebb tide in Hallet's Point swings into Pot Cove on the Astoria shore east of Hallet's Point and then bears off strongly westward past Hallet's Point.

It is claimed by the Reichert that when the Mohawk got into this westerly set of the ebb tide she was prevented by it from turning to starboard in order to round Hallet's Point, and that the effect of the tide on her starboard bow was to hold her headed directly across Hell Gate towards the Reichert's tow. I think that this is true.

At this time the Reichert, hoping, in extremis, to get her tow clear of the Mohawk, put on a maximum head of steam and starboarded her helm in the hope of dragging her tow out of the way of the Mohawk. She also blew alarm signals.

The Mohawk seems to have maintained her speed until perhaps half a minute before the collision when she reversed her engines. She struck the port side of the scow Ceres approximately at right angles and caused considerable damage for which this libel was brought by the owner of the scow.

When an accident of this kind happens and such conflict of evidence as I find here is involved, the trier of the facts has to deal with the situation largely on the basis of the impression which the witnesses have made on him.

I have already mentioned my impression of the Mohawk's witnesses. As far as the captain of the Reichert is concerned, I think that he told a very straightforward story.

IV. I attribute the collision to the fact that the Mohawk, coming up fast, did not stop at Hallet's Point and give the Reichert and her tow a chance to get around the bend and straighten down the river which the Reichert was justified in expecting her to do.

After hearing the one-blast signal from the Reichert, whether she had first blown a two-blast signal or not, the Mohawk should have held back and given the Reichert a chance to carry out the manoeuvre which she had indicated.

Therefore I hold the Mohawk in fault and solely to blame for this collision.

V. Findings of fact and conclusions of law in accordance with this opinion may be presented on two days' notice.

After these findings are signed and filed, an interlocutory decree may be submitted on two days' notice providing for the dismissal of the libel, with costs, as against the tug Reichert, and allowing a recovery as against the Mohawk, with costs, including such costs as the libelant may have to pay the Reichert, and providing for a reference to a commissioner for the assessment of the damages suffered by the Ceres.