## THE JEAN JADOT.

### In re COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S. A.
#### No. 12950.

District Court, E. D. New York.

Jan. 3, 1933.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (W. H. McGrann and J. Harvey Turnure, both of New York City, of counsel), for petitioner.

Rumsey & Morgan, of New York City, and Hale & Dorr and Burnham, Bingham, Gould & Murphy, all of Boston, Mass. (Albert T. Gould, of Boston, Mass., Mark W. Maclay and Ralph W. Brown, both of New York City, and Grafton L. Wilson, of Boston, Mass., of counsel), for the Eleanor Nickerson, Inc., and other claimants.

Lester B. Donahue and Purrington & McConnell, all of New York City, Whalen & Christiansen, of Boston, Mass., and W. Henry Finnegan, of Malden, Mass. (Lester B. Donahue and Frank J. McConnell, both of New York City, Sylvester F. Whalen and A. F. Christiansen, both of Boston, Mass., and W. Henry Finnegan, of Malden, Mass., of counsel), for various claimants.

Halpert & Burger, of New York City, and Harry Kisloff, of Boston, Mass. (Harry Kisloff, of Boston, Mass., of counsel), for various claimants.

BYERS, District Judge.

The owner of the Belgian steamship Jean Jadot seeks limitation of and exemption from liability arising from the sinking of the fishing schooner Eleanor Nickerson out of Boston, which occurred on February 5, 1932, near La Have Bank off the coast of Nova Scotia.

The Jadot struck the Nickerson forward of the starboard quarter, and cut through entirely, so that the stern of the schooner was sheered off in a diagonal running from the point of contact, aft to a point about 8 feet forward of the stern on the port side. The schooner sank almost at once, with the loss of 21 men of a crew of 27.

The precise time of this occurrence is difficult of determination; it was shortly after break of day, but whether the moment of astronomical sunrise had been reached or not, is the subject of controversy. Snow had fallen intermittently during the hour which preceded the event, and, according to the schooner's time, the watch which went on duty at 7:06 o'clock was in the act of relieving the prior watch.

According to the steamer's clock, which showed time calculated upon the position at the previous noon, the collision took place at about 6:45 a. m. To this should be added a conceded error of seven minutes, which would correct the steamer's time to 6:52 a. m.

The importance of the time lies in the question of whether the schooner's side lights should have been burning when she was sighted from the bridge of the Jadot, about one point off the port bow, at a distance (estimated by the first officer who then made her out) of about 3/8 of a mile, or roughly 2,000 feet, which was about 4½ ship's lengths.

The wind was of gale force (No. 8 on the Beaufort Scale) out of the east north east, and the waves were about 20 feet high, the crests being spaced about 40 feet apart.

There is no issue made concerning the right to limit.

The questions requiring examination are the charges of fault on the part of the respective vessels. It will be convenient to consider first those attributed to the steamer:

The Jean Jadot is a single screw coal burning freight steamer, built in Germany in

1929; her deadweight is 9,300 tons, length 443 feet, beam 51 feet, with a maximum draft of 25 feet, 9 inches. This voyage began at Antwerp on January 27, 1932, and a full complement of 60 men was carried, including officers. New York was the port of destination; the cargo was light, i. e., 2,900 tons (22½ feet draft) and the grand circle course was followed from Bishop to Nantucket. From noon of February 4th, the steamer was on course 239 true, and 263 on the standard compass that was being used; this is based on an error as computed or assumed, of 4° for deviation and 20° for variation.

The course is described in petitioner's brief as equivalent to a magnetic heading of about west by south.

The first officer went on duty at 4:00 a. m. of this day, and with him on watch were the fourth officer on the bridge, a man at the wheel, a lookout, and one man on deck. The lookout was posted on the bow, but, due to spray, was moved to the bridge on the weather side. The time of this change was about 5:30; it is stated that this was necessary because the deck was freezing, the temperature being 2° below zero, also because the ship was rolling hard, which meant that footing on the bow was precarious. After 6 o'clock the rolling was accompanied by pitching; that caused the engines to race, but full engine speed was maintained none the less. During the ensuing 45 minutes all sea and weather conditions increased in intensity.

Horizon conditions at 6:40 a. m. were testified to as follows, by the first officer: "The visibility was about two miles, sir. Dawn was breaking in the eastern sky, daylight—no, no. It was clear in the east on the horizon, and dark in the western horizon."

When the lookout was posted on the bridge, he stood on the port, and the first officer on the starboard side. The wheel house intervened, and communication from one side of the bridge to the other was through that house, which had doors either side.

About five or ten minutes before the collision, the lookout was sent below to get some coffee, and he was not on duty while the disaster was in the making.

The significance of his absence is apparent, in recalling that the schooner was sighted one point off the port bow, by the first officer, on the starboard side of the bridge.

The atmospheric conditions prevailing during the interval of from 6:40 to 6:45 (according to the ship's clock) have not been too clearly revealed so far as the Jadot is concerned.

The first officer says that a heavy snow squall set in, after the collision.

The fourth officer said that before the collision he saw some snow. Upon being pressed by the ship's proctor, he said: "We had, I think, just ten minutes before the collision, we had a little bit of snow yet." That is the time he fixed apparently for the stopping of the snow.

The rough log, containing entries for this period of the day made by the fourth officer at the dictation of the first officer, has the following: "Heavy sea, sky overcast, horizon obscured at intervals, snow squalls, vessel rolling and pitching and straining heavily. Shipping seas on after deck. 6:45 collided," etc.

In the absence of positive statement concerning the frequency, area and duration of the snow squalls, it is difficult to establish more than is contained in the foregoing recital respecting weather conditions as observed aboard the Jadot, during the ten minutes or so that preceded the collision.

When the Nickerson was sighted by the first officer in the position stated, crossing ahead of the steamer from port to starboard, she was in the trough of the sea, and all that was visible was the top half, or less, of the foresail. It should be stated in parenthesis that this was the only sail being carried by the schooner at that time.

The observer gave the order to port the ship, intending to pass under the stern of the Nickerson. He hurried into the wheelhouse to give the helmsman a hand at the wheel (which operated the hydraulic gear) and was so engaged for perhaps half a minute, and then returned to his former station.

No signal was blown on the siren, or otherwise given to notify the Nickerson of the presence of the Jadot.

Again the first officer saw the schooner, this time on the crest of a wave, and her hull stood forth in sight, against the western horizon.

The observer does not give the position of the schooner at that instant, but testifies that he looked for lights and saw none, i. e., a starboard side light. That he saw no one on the deck.

At that moment he says that visibility was about two miles; that is, he could have seen a light at that distance.

The steamer commenced to swing in answer to her helm, but the officer said he could not tell how much; he says the schooner had headway, for her foresail was full.

Then the Jadot hit the Nickerson "somewheres aft."

The only other witness to the collision called by the petitioner was the fourth officer, and his testimony adds little to the narrative. He was in the wheel-house, receiving a report from a cadet concerning temperature in a refrigerating space, when he heard the order given to put the wheel hard over. He emerged to the bridge, starboard side, and saw the schooner a length ahead, thus: "Well, I see just the forecastle head of the Jean Jadot between the two masts of the schooner."

He said later that the forecastle head of his own ship was not shutting off the schooner, and that he could see her completely; that he looked for lights on her and saw none; that, if there had been a man on her deck, he could have seen him, but that he saw none.

A few seconds later the collision occurred as has been stated.

The faults of the steamer, as gleaned from the foregoing, may be considered in the order of their clarity, thus:

A. No signal was given, when the schooner was sighted, of the course that the steamer contemplated, i. e., to port. This subject is scarcely discussed by the petitioner, being somewhat casually dismissed with the comment that no signal would have been heard on the schooner because of the weather conditions, and also because no one was on watch on the Nickerson. The latter subject will be discussed presently, pending which it may be permitted to observe that nothing was deposed for the Jadot to the effect that the failure to apprise the crew of the schooner that, although bearing down upon them, the steamer was contemplating a port turn, was the result of deliberation based upon observation that there was no watch maintained on the fishing craft.

The violation of article 28 of the International Rules is clear and unmistakable. The provision is as follows:

"§ 113. Sound signals of steam vessel indicating course. Art. 28. The words 'short blast' used in this article shall mean a blast of about one second's duration.

"When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these rules, shall indicate that course by the following signals on her whistle or siren, namely:

"One short blast to mean, 'I am directing my course to starboard.'

"Two short blasts to mean, 'I am directing my course to port.'

"Three short blasts to mean, 'My engines are going at full speed astern.' (Aug. 19, 1890, c. 802, § 1, 26 Stat. 328.)" Title 33 USCA § 113.

The foregoing provides an answer to the argument pressed for the petitioner, that, if the slightest effort had been made on board the schooner to avoid the contact, such as permitting the craft to fall off into the wind by releasing the becket on the wheel, the schooner might have gone clear. Certainly a timely warning of the approach and probable course of the steamer would have been calculated to initiate such a process.

B. There was no lookout on duty immediately prior to the collision.

The petitioner seeks to avoid this established fact by arguing that there were two officers on the bridge performing this duty; and that, if the lookout had not been relieved and had been at his post, he would not have sighted the schooner before the first officer observed her.

The fact is found that, at the time the Nickerson was sighted, there was only one officer on the bridge, namely, the first officer, and he was in charge of navigation. Reference should be made, at this point, to the petitioner's failure to call the lookout himself, or the man at the wheel, or the cadet, or the seaman referred to in the first officer's testimony as having been on deck. Also to the fact that, when the lookout who was first stationed on the bow was told to leave that station, he was not sent to the crow's nest, which was a protected place, accessible by ladder on the aft side of the foremast, and having a bell communication with the bridge.

The height of the crow's nest above the bridge is not stated, but obviously it afforded a post of wider observation than the bridge, particularly in such a sea as was running.

The argument for the petitioner, that the absence of the lookout did not change the course of events, because of the presence of the first officer on the bridge, is not aided by The Victory (1897) 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519, in which a collision in the Elizabeth river was held to be solely the fault of the Victory, under circumstances quite remote from those here involved.

While it cannot be announced that a lookout would have sighted the Nickerson before the first officer on the bridge, no more can it be asserted that such would not have been the inevitable consequence of his being at his post.

In deciding that the Jadot was at fault in this respect, the following cases among others have been consulted: The Ottawa, 3 Wall. 269, 18 L. Ed. 165; The Patria (D. C.) 92 F. 411, at page 414; The Sagamore (C. C. A.) 247 F. 743, at page 754.

The rough log entry, to which reference has been made, discloses a tardy appreciation, after the collision, of the duties resting upon the steamer under the conditions shown to have been prevailing.

C. The Jadot failed to keep out of the way of the Nickerson (International Rule 20 [33 USCA § 105]) and, on approaching, did not slacken her speed or reverse (International Rule 23 [33 USCA § 108]).

It is not feasible to consider these elements of the case apart from the related matters of speed and failure to give the signals required by the same code of rules (Rule 15 [33 USCA § 91]) in conditions of fog, mist, falling snow, or heavy rainstorms by day or by night; by Rule 16 (33 USCA § 92), the requirement was "moderate speed" under such conditions of weather.

Concerning the speed of the Jadot, it has been stated that the engines were operating at full speed, and, while the propeller was racing during the 4 to 8 watch, there was no throttling of the engines. Full speed under normal conditions of this vessel was 13½ knots, but clearly the rolling and pitching referred to in seas of the size shown must have cut that rate down; the wind was of gale strength, taking effect on the port quarter, and the seas were following, and these factors served perhaps to mitigate the loss of head motion caused by the racing of the propeller.

The captain was asleep in his cabin until just prior to the collision, when he hurried to the bridge, having been wakened by the "hard over" order to the helmsman; he had thus an opportunity to observe the speed of his ship, and gave it as "not far from 14 knots." The first officer puts it at 10 knots. Estimates made by the second assistant engineer, who was below, are not thought to be of assistance.

Because the master and the first officer were so far apart in their observations, it is apparent that this court can make no intelligent finding on the subject. The decision will proceed upon the belief that the Jadot was making a speed of not less than 12 knots.

Weather conditions as shown within the half hour preceding the collision must govern the question of whether this was excessive or moderate.

That snow had been falling at about ten minutes before the collision has been stated. How much snow must fall to render operative the requirements for giving the specified signals and proceeding at "moderate" speed, cannot be the subject of abstract statement. If enough snow had been falling to screen the steamer from the vision of a possible observer, or to curtain sections of the area of sea visible from the Jadot, then the conditions prevailed which set the rules in operation. The ship's log refers to snow squalls, which means intermittent fall; otherwise, areas of the sea which were clear and obscure by turns. That such conditions did prevail and did point to danger, would seem too plain for discussion.

It is found therefore that the Jadot was at fault for failing to reduce her speed, and for failing to give the specified signals, in accordance with the requirements of the International Rules governing conditions of falling snow.

That the speed of the steamer was a most potent factor in the disaster appears quite clearly from the argument pressed by the petitioner with some elaboration, that the failure of the schooner to alter her course was the real cause of the disaster. If the speed of the steamer had been moderate, her own course could have been changed, or she could have met her duty to slacken and reverse and thereby avoid the havoc shown to have been wrought because neither of those requirements was met.

In the Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 125, 34 L. Ed. 687, involving a collision in a fog between a steamer and a schooner, the steamer was held for full damages, and the opinion contains the following: "The rule laid down in the last-named case is that, at whatever rate a steamer was going, if she was going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate."

The Jadot not only might have seen the Nickerson; she did see her at a distance of 2,000 feet. Putting the steamer to port, at full speed of about 12 knots, brought her within 40 feet of clearing the schooner's

stern. Can it be doubted that, at a speed of 6 knots, the contact would have been averted, either by the turn to port, or by slackening or stopping and reversing?

In The Sagamore, supra, a steamer, proceeding at slow speed in a fog, struck and sank a fishing schooner off the coast of Nova Scotia in the vicinity of the Grand Banks. The majority of the Circuit Court of Appeals reversed a decree exonerating the steamer, and said in part: "The steamer had considerably more than seeing distance in which to bring herself to a full stop by reversing after hearing the schooner's horn, and failed to do so. In spite of the fact that instant porting of the wheel may have been the right maneuver, there was too little time to make it effective, and she struck the schooner with such force as to cut deeply into her and sink her within a few minutes. The steamer was bound to keep clear, and the burden rests upon her to show a sufficient reason for her failure to do so."

The foregoing had to do with a steamer moving at slow speed, and much of the opinion discusses what is moderate speed under such conditions, having in mind the necessity for maintaining steerage way. In this case there is no such perplexity. Full speed was maintained, and the force of the impact may be judged by the fact that the Nickerson, which was a sturdy craft, was cut cleanly in two.

The petitioner cites The Kaiserin Maria Theresa (C. C. A.) 149 F. 97, 99. The steamer overhauled and crashed into a sailing vessel displaying no light visible astern. The steamer was exonerated, even though she failed to reduce her speed. The opinion contains the following: "In the case at bar the night was dark and cloudy, but there was no fog, mist, falling snow or rain, heavy or light, and lights could be seen for miles." Conditions quite dissimilar to those here involved.

Clear night conditions also prevailed in Kennedy v. Steamer Sarmatian (C. C.) 2 F. 911, and The City of London, 1 Swab. 245, cited in petitioner's brief.

The testimony of the fourth officer and the entries in the rough log of the Jadot are thought to establish that, during the half hour which preceded this collision, clear weather conditions did not obtain.

The faults of the Jadot were so numerous and manifest that they seem not to require further elaboration.

There remains to consider the faults attributed by the Jadot to the schooner, and the extent to which it may be thought that they contributed to the disaster.

With reference to the Nickerson, it is to be borne in mind that, of necessity, the evidence is fragmentary and incomplete. The master, the engineer and nineteen others of the crew perished almost instantly as the result of the collision, and the narratives of the survivors fail to include much that could have been supplied by some of those whose lives were lost.

The Eleanor Nickerson was a power fishing vessel of schooner rig, 127 feet over-all, with a beam of 25 feet, 8 inches, and a depth of hold of 11 feet, 5 inches; her freeboard, light, was 4 feet amidships; her bulwarks were 23 inches in height; she had two masts and her sails consisted of a storm trysail, foresail, forestaysail and jib. There was no bowsprit. No mainsail was carried at this time. Power was supplied by an 18 h. p. Diesel engine. Her tonnage was 143 gross and 113 net.

Lighting was furnished by storage batteries which were charged by a 32-volt generator. The side lights were electric, and had a visibility on clear dark nights of three miles. The remainder of the lighting equipment was adequate, and included two "big flare lights with four 50-watt lamps in them," and baiting lights could be rigged at the sides for the night baiting of trawls. A hand-operated Lathrop foghorn was carried, and was operated during the 5 to 6 watch in the early morning of the day in question.

The schooner was built in 1927, and in February of 1932 all of her gear and equipment was in first class condition, having been examined, replaced, and repaired as needed, within two months.

In 1930, a pilot-house was erected on deck, so as to house the wheel, which was in the stern, aft of the gangway leading below into the cabin. This pilot-house was in effect a continuation of the cabin housing or trunk, and was 6 feet high. The cabin trunk was 28 inches high; the gangway was enclosed by three windows, one looking forward, and the others diagonally to starboard and port. Aft of these latter, and at the wheel itself, were solid doors opening on the deck, on both sides. The aft wall of the pilot-house contained a window affording a view directly astern. The wheel was hand-operated, and about 6 full turns were required to put the helm hard over.

The schooner's hull was painted black, and the cabin trunk and pilot-house were

white at the top and dark at the bottom. The sails were natural canvas color—light.

The schooner had two compasses, the one in use being set in a binnacle built in the cabin trunk in the forward end of the pilot-house.

The captain was Irving Morrissey, who had held that berth for six months, and he was an experienced man in handling fishing schooners.

The crew was made up of competent seamen and good fishermen.

The side lights were located in the fore-rigging (shrouds) 10 feet above the deck, and were properly boxed.

All of the electric lighting, which included the side lights, was controlled from a switch in the engine room, and the engineer was in charge of this switch.

The foresail, when carried, was in height 48 feet in the luff, and 53 feet in the leech; the foremast from step to peak was 76 feet, of which 9 feet was below deck. The mainmast was 81 feet, of which 10 feet was below deck.

The accommodations for the crew enabled nineteen men to bunk forward in the forecastle, and eight aft in the cabin.

Twenty-two men stood watch, two at a time, from 6:00 o'clock to 6:00 o'clock. Each period of twelve hours was divided by eleven, so that each watch was on duty one hour and six minutes, except from 5:00 to 6:00 o'clock, when the tour was for an even hour.

The two men on watch divided their duties so that one man took the wheel for the first half of the watch, and the other acted as lookout, and during the second half these duties were reversed.

This cruise of the Nickerson began on February 1st, when she made out from Boston, bound for the Fishing Banks; on the night of February 4th and early morning of the 5th, she was proceeding near La Have Bank under engine power, with her trysail (riding sail) and foresail set.

The watch between 5:00 and 6:00 o'clock in the morning of February 5th was stood by Frank Le Blanc, a survivor, and Knickle, who was lost. Frank had the wheel until about 5:30, when he went below and told the captain that the rising wind and sea were so strong that he thought the power should be turned off. The captain told him to call all hands on deck, to take in the trysail, and about that time the use of power was discontinued. The men below responded to Le Blanc's call, and

the trysail was taken in and furled. This required about twenty minutes or so.

Frank continued his watch while this was going on, and was acting as lookout on the starboard deck forward during part of this time.

Hemeon, also a survivor, was among those called at this time, but, instead of furling the sail, he acted as lookout on the port bow.

During this interval, it was dark, and both of these men saw the side lights of the Nickerson burning brightly. The schooner ran before the wind while the furling took place, and at its conclusion she was brought about and hove to.

The next watch began at 6:00 o'clock and continued until 7:06, and was stood by Horn and Moulaison. Both of them were lost, and the incidents of their watch therefore have not been disclosed.

The next watch was that of Paul Le Blanc and Burke, who are survivors; they were called to duty between 7:00 and 7:06 o'clock, and, after pulling on their boots and oilskins, made their way aft from the forecastle, along the starboard deck, and aft to the pilot-house, which both entered through the starboard door. At this time, it was snowing heavily, and seas were being shipped over the starboard rail, in such force that these men thought it was dangerous, for the moment, to remain on deck. The compass course of the schooner at this time was N. E. by N.

Arriving at the pilot-house, these men found Moulaison standing there by the port window; a becket was made fast to the wheel, which held it hard over to starboard; Frazier (who perished) was also in the pilot-house, standing alongside the wheel.

Almost at once, Eakins came up the companionway from the cabin, which led into the pilot-house, and he went out on deck, using the port door. As he did so, he made an audible remark, or asked a question, something like "What is this smoke?", and at that time Burke opened the starboard door, went on deck, and, looking to windward, saw the Jadot headed for the schooner, and distant about three or four lengths of the Nickerson (around 400 feet). Burke shouted an alarm so lustily that it was heard below as well as by Paul Le Blanc who came out of the pilot-house to port and took up the cry; in a few seconds many of the fishermen in the forecastle made their way to the deck, but not before the Jadot had plowed through the Nickerson, striking the starboard side forward of the cabin, as has been stated.

Dories were cut loose on both sides of the schooner, but she went down by the stern before they could be launched.

Paul Le Blanc and Burke, the watch, Frank Le Blanc, who was in the cabin but who made his way out after seeing the stem of the Jadot entering the cabin, Hemeon, Burbine and Feltmate, who were in the forecastle when Burke cried out his discovery, all managed to enter one dory (adequate for two men to use in fishing) after some of them had struggled through the wreckage in the sea, and, though it was stove in at the side and half filled with water, they kept it afloat for some twenty minutes or so. The Jadot made a circle and arrived back at the vicinity of the collision at the end of that time, and a sufficient lee was contrived to afford the survivors an opportunity to come alongside, and thus to be taken on the ship.

The Jadot remained within the area of the collision for nearly two hours, in the effort to find other survivors, but the quest was without success, and at about 9:00 o'clock she resumed her course for her port of destination.

At the time of striking the Nickerson, nothing was thrown overboard from the ship to identify the locality.

The exact time of the collision cannot be stated. The schooner was receiving radio advice daily, including broadcasts of market conditions, in the course of which local time was stated, and upon that information the clock was set, and the duration of the watches regulated. As has been stated, Burke and Paul Le Blanc had been called, and reported for duty at 7:06, and the collision occurred within perhaps two minutes thereafter.

The Jadot's clock had been set the night before, to show apparent time at her contemplated position at noon on February 5th. According to her clock, the time of impact was 6:45. The master computed an error of retardation of seven minutes, which would fix 6:52 as the time by the ship's clock.

The master fixed sunrise, local apparent time, at the ship's position by dead reckoning at 7:01, and the first officer at 7:03.

As the ship's position was calculated by dead reckoning, and the master had assumed a speed of "something like 13 miles" (knots?) for this purpose, from his position at the previous noon; and as he testified that the Jadot was making 14 knots in his opinion at the time in question, it becomes obvious that approximations form the basis of this conclusion.

For clarity of the record, it should be stated that the master fixes the place of collision by dead reckoning as Lat. 43° 5' North, and Long. 63° 45' West.

It will be assumed that the moment of sunrise at that position was the mean of the testimony of the master and the first officer, namely, 7:02 a. m.

It will not be assumed, however, that the place where the collision actually occurred has been stated with such precision as to constitute the basis for a finding by this court. In consequence, the hour of sunrise at that point has not been similarly disclosed.

It is not deemed that the time revealed by the ship's clock has been shown to have been closer to the true solar time on the morning of February 5, 1932, at the place where the Jadot ran down the Nickerson, than that shown by the schooner's clock.

The failure of these two instruments to synchronize does not point to the necessity for accepting the one and repudiating the other. If a choice had to be made, the one regulated by radio broadcast would be preferred to the one set in anticipation of an assumed position to be attained some hours later.

It is concluded therefore that the exact time involved has not been shown.

The witnesses for the schooner say that it was daylight, and snowing hard. The first officer for the Jadot used the expression "daylight" and then said "No, no." The master answered without reservation a question in which "broad daylight" was used referring to the time he came to the wheel house.

The first and fourth officers fixed visibility at two miles, even against the background of a dark sky in the west. In so doing, it is recalled that they were testifying for a vessel which was proceeding through an area of falling snow, at full speed and without sounding signals, and they could not be expected therefore to understate the visibility.

Taking all the circumstances into consideration, it cannot be thought that the evidence would support a finding that the moment of sunrise had not occurred, when the first officer of the Jadot made out the Nickerson in the position stated.

It is found, however, that daylight prevailed, and that visibility was not obscured by the absence thereof, but by the presence of falling snow, and that such had been the condition at the place where the collision occurred for not less than five minutes prior thereto.

The Jadot contends that the Nickerson was not displaying side lights at the time she was sighted, and the testimony of the fourth officer is to that effect. At his first view, the first officer saw only the top half of her foresail, and her lights would not have been visible, as the schooner was in the trough. After entering the wheel house and there assisting the helmsman, he returned to the bridge, and viewed the Nickerson completely. He said on the trial that then he looked for lights and saw none.

From the angle of incidence, it is clear that he was in a position to see at least the starboard light if it was burning. He says he saw no one on deck at this time. The witness does not fix the interval of time between this second view of the Nickerson and the striking, nor does he say that he kept her continuously in view. The failure to observe men on deck, when it is known that both Le Blanc and Burke moved aft on the starboard side at about 7:06, and that, within a short space, Burke emerged from the pilot house, observed the Jadot and did what he could to arouse his shipmates, somewhat puts into question the completeness and accuracy of the first officer's observation at this time.

If he failed to see one man known to have been on deck just prior to the collision, is it safe to rely upon his failure to see the light which may or may not have been burning?

Hard upon quitting the 4 to 8 watch on the Jadot, the first officer instructed the fourth officer as to the log entries in evidence, and no reference therein appears, to indicate that the schooner's lights were not burning. This, of course, does not prove that they were, but it does prove that the first officer did not then deem the absence of lights sufficiently important for inclusion in the log.

The side lights of the Nickerson were testified to, during the 5 to 6 watch. There is nothing in the testimony on that subject for her thereafter. While jogging, i. e., under sail alone, she was required to carry only side lights, and is shown to have done so, by Hemeon, after the power was shut off at 5:30 o'clock. This disposes of petitioner's suggestion that the lights failed when the engine was stopped. The batteries supplied power for the lights, not the engine, which operated the generator which did the charging. That Burke and Paul Le Blanc failed to look for these lights which were overhead and not in their area of vision as they moved aft to the pilot-house, about 7:06, proves nothing except that they were honest enough not to attempt to testify on the subject.

The record has been carefully scrutinized, and, while the only affirmative evidence is that of the ship's officers, to the effect that the lights were not burning just prior to the collision, no finding to that effect will be made, for two reasons: first, the evidence leaves something to be desired of persuasiveness; and, second, the case as a whole is as consistent with the passing of the moment of sunrise at the time the Nickerson was sighted, as with the reverse. Of the two, the former condition is the more probable.

Had the Jadot's handling comported with the requirements of the International Rules to which reference has been made, a more difficult problem would be presented, but, by her own testimony, the Nickerson was sighted in time to avoid the catastrophe, and it has not been shown that the schooner, by act or omission, contributed to that event.

Fault is attributed by the Jadot to the schooner for having no lookout. Burke and Paul Le Blanc were on duty, and they are criticized for having been in the pilot-house instead of on deck. Both men testified that the waves were breaking over the schooner, and they did not think they would be safe if they remained on the exposed deck. While the top of the bulwarks was four feet or so above the surface of the water, the force of the wind and the size of the waves were entirely compatible with this apprehension.

This criticism is offered on behalf of a 9,000 ton ship, from the forward deck of which a lookout had been removed to the bridge for his own safety, although the seas and the wind were following.

No case has been cited for the Jadot, nor has one been found by the court, in which a schooner was held at fault for permitting a lookout to be posted in such a pilot-house as that of the Nickerson, under similar conditions of wind and weather. That Burke was in his oilskins and boots when received on board the Jadot, is consistent with a purpose on his part to take up lookout duties on deck. That he was so equipped, the evidence for the Jadot corroborates. Paul Le Blanc, of the same watch, testified that his apparel was the same; while this was denied for the Jadot, the issue, if issue there be, is resolved in favor of Le Blanc's testimony.

The contention is that Burke should not have made his way aft to the pilot-house at all, but should have remained on deck; had he done so and been struck by a wave, he might not have been able to raise the cry that he did, as he emerged from the pilot-house following Eakin's reference to the

smoke. That alarm was responsible for saving the three men who were in the forecastle, and Frank Le Blanc who was in the cabin.

Many cases which hold that even a privileged vessel is not relieved of her duty to maintain a lookout, have been examined, and none has been found involving circumstances similar to, or even resembling, those here presented. Burke was on duty, and, being in the pilot-house, he could have seen, through the starboard window, the approach of the Jadot, had that been discernible. Had the latter been sounding her siren, the wind would have carried the sound directly to the Nickerson, but no such warning was given, and, in the absence of such, it is not perceived how negligence can be attributed to her lookout, under the conditions of falling snow which prevailed.

It is urged that a vigilant man on watch, on seeing the steamer, would have released the becket on the wheel, whereby the schooner would have fallen off the wind, and could have been maneuvered so as to avoid the oncoming vessel. Whether this could have been contrived would depend upon the length of time available for the purpose.

In cross-examination of the schooner's crew, certain questions were asked in an effort to show that she was prompt in answering her helm, and that she would pivot quickly. Such inquiries rather defeated their purpose, because it was developed that, in dragging an inert propeller, the schooner was not lively in stays.

These arguments are speculative and lead to no helpful conclusion. The Nickerson was not hove to without men on watch, as asserted in the petition; she was run down and sunk by a powerful steamship which was not being navigated as the law requires, at a time and under conditions wherein the men on watch were not at fault. While it is true that the schooner was making perhaps one knot an hour, and her course made her yaw, coming into and falling off the wind, she was trying to weather a heavy storm at sea, and, when the Jadot was sighted, she was too close aboard to allow the watch on the Nickerson to do other than scramble for their lives, seeking the while to summon their shipmates. The proof fails to show that an alteration in the Nickerson's course could have been made, or should have been attempted.

The Jadot was at fault, and the Nickerson was not; the limitation is granted, and the claims will be adjudicated upon that basis.

Settle decree on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.