## THE TRANSFER TUG NO. 9.

### THE CALDERON.

(District Court, S. D. New York. September 29, 1906.)

COLLISION—STEAM VESSELS MEETING—MUTUAL FAULT.

> The steamship Calderon, passing out to sea, and a transfer tug with a car float on each side, meeting in New York Harbor about half way between the Battery and Governor's Island in the early morning, both *held* in fault for a collision between the Calderon and the car floats—the Calderon for initiating an agreement to pass to the left and after it was assented to attempting to pass to the right, also for excessive speed, which was probably 12 or 14 miles an hour, and for her failure to sooner stop and reverse; the Transfer for assenting to the signal to pass to the left and attempting to carry out the agreement when her heading was such that a passing to the right was apparently proper, and she was showing a red light to the Calderon, and also for not sooner stopping and backing.

> [Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 40.]

In Admirality. Cross-suits for collision.

Wing, Putman & Burlingham, for the Calderon.

William Greenough, Henry G. Ward, and William S. Montgomery, for Transfer No. 9 and the floats.

James J. Macklin, for the cargo on the floats.

ADAMS, District Judge. These were cross actions to recover the damages sustained through a collision between Transfer Tug No. 9 with 2 loaded floats in tow, one on each side, and the steamship Calderon, loaded and bound to sea, which occurred on the 28th day of January, 1906, just before daylight, about half way between the Battery and Governor's Island in New York Harbor. The original action was brought by the Societe Anonyme de Navigation Royale Belge Sud-Americaine, as owner of the steamship Calderon, against the steamtug Transfer No. 9 and her car floats to recover damages alleged to amount to $10,000, and shortly thereafter the New York, New Haven & Hartford Railroad Company, as owner of the Transfer tug and floats, brought the cross action, alleging damages at $30,000.

The tug was about 100 feet long and the car floats were each about 275 feet long. They had started early in the morning from Dock 6 of the Central Railroad of New Jersey at Communipaw. The tug had float No. 2 on her starboard side and float No. 12 on her port side. The floats had 14 or 15 cars on them but they were not unusually loaded and the tug had no difficulty in handling them. They proceeded across the North River, the last of the ebb tide, which was prevailing there, setting the tow down the river somewhat so that when she reached the East River current, from the beginning of the flood tide, she was well in the center of the river, betwen the Battery and Governor's Island.

The Calderon was about 390 feet long and 47 feet 5 inches beam. She was bound to Manchester, England, and being fully loaded she started from her pier 8 in Brooklyn, a short distance above the Wall

Street Ferry, with the assistance of the tug Dalzell. She was at first set up the river slightly with the flood current but the tug straightened her down the river and she then proceeded, under her own steam, between the Battery and Governor's Island.

The Transfer's account of the matter is as follows:

"That said floats were laden with fifteen cars containing merchandise; the tow thus made up started from her said pier 6 at about 6:25 A. M. bound for Oak Point, New York, the tide being slack water in the North River at said time and about the first of the flood tide in the East River.

That when said steamtug "Transfer No. 9" and said floats were rounding the Battery and about half way between said Battery and the two red lights on Governor's Island those in charge of the navigation of the said steamtug "Transfer No. 9" observed a steamship coming down the said East River, which steamship afterwards proved to be the "Calderon," the said steamer exhibiting, of her side lights, only the green, to that of the green light of the said steamtug, the said steamer at the time being a little below the South Ferry on the Manhattan shore. That while the vessels were in this situation and proceeding green to green, the said steamship blew a signal of two whistles to the said steamtug "Transfer No. 9," which "Transfer No. 9" immediately answered with a signal of two whistles and starboarded her wheel. That in company with the said steamship coming down the East River and a little astern of her and on her starboard side was a Sound steamer and also bound up the river and a little ahead of the steamtug "Transfer No. 9" with her tow was a steamtug. That said Sound steamer sounded a signal of one whistle which was answered by both, said steamtug having a tow a short distance ahead of and on the port hand of "Transfer No. 9," but in order to clear the said Sound steamer it was not necessary for the said steamtug "Transfer No. 9" to port her wheel; that said steamship then blew a signal of one whistle, she approaching at a high and unlawful rate of speed and ported her wheel giving the said steamship a rank sheer to starboard; whereupon alarm whistles were sounded by the said steamtug "Transfer No. 9" and her engines reversed full speed astern, but that said steamship coming on, struck float No. 2 to-wit the starboard float, on her port bow with the port bow of the said steamer, breaking the said float loose from her fastenings as well as the float on the port side of said tug and doing such damage to said car float No. 2 that she subsequently sunk at the Quartermaster's dock on Governor's Island, where she was taken to in order to prevent her from sinking in deep water, the cars and contents of the same on said float being submerged and the cargo in said cars very seriously damaged and considerable quantity of the same lost.

That said steamtug "Transfer No. 9," as well as the said car floats, although it was substantially daylight or break of day, had all their lights required by law properly set and brightly burning, and that a proper lookout was maintained and that said steamtug as well as the said tow were properly officered and manned by competent and skilful persons.

That said collision occurred in the vicinity or abreast of the City Dump Docks at the Battery and about 700 feet therefrom.

Fourth: That said collision was wholly owing to the fault, negligence and carelessness of those in charge and controlling the said steamship:

(1) In proceeding at a high and unjustifiable rate of speed.

(2) In not keeping a proper lookout.

(3) In not conforming with her signal of two whistles and proceeding to the starboard of the said steamtug "Transfer No. 9" and her said floats to-wit starboard to starboard.

(4) In not slowing, stopping and backing before collision and in time to avoid the same.

(5) In blowing a signal of one whistle.

(6) In not sounding alarm whistles.

(7) In not doing anything to prevent collision."

The Calderon's account of the matter is as follows:

"Second. On January 28th inst., at about 6:30 A. M. being not yet daylight, the Calderon left Pier 8, Brooklyn, laden with a general cargo, bound for Manchester, England. She was fully manned and equipped, in charge of an experienced master, with a skilled Sandy Hook pilot to take her to sea. The weather was clear, with light drizzling rain; tide in the East River slack, or the first of the flood, with light easterly wind. · The Calderon was assisted out of her slip by a tugboat, which she dismissed when headed down the river. A lookout was forward at the steamship's bow; the chief officer with a seaman was also on the forecastle head looking out. The master, pilot, and third officer were on the bridge, where was also the quartermaster steering the ship. The Calderon had set and burning her regulation lights including two white masthead range lights, all of which were showing brightly.

Third. When the Calderon was about in the middle of the fairway between New York and Governor's Island, and heading westerly, a red light was seen bearing about a half point on the starboard bow and about a third of a mile off, from which came a single blast of the whistle. The Calderon answered with one blast, and ported her helm swinging towards New York. This red light crossed over to the Calderon's port bow, when both the red and green lights showed, followed by only the green light, upon which the Calderon's engines were stopped. Immediately afterwards the other vessel blew two blasts of her whistle and appeared to starboard her helm; whereupon the Calderon also starboarded her helm but reversed her engines full speed. It was seen that the approaching object consisted of two large carfloats lashed on each side of the steamtug called the Transfer No. 9, which had turned to the eastward, across the Calderon's bow.

Although the Calderon's engines continued to go back full speed, the starboard carfloat came in violent contact with the steamer's port bow, breaking several plates and frames near the stem. She was afterwards struck by the other carfloat, damaging her starboard bow; whereupon the carfloats parted, the port float passing on by her momentum along to the starboard of the Calderon, and the tug and starboard carfloat upon the Calderon's port side.

After the collision the Calderon stopped backing, investigated her damages, and then went to an anchorage off Liberty Island.

Fourth. The Calderon's hurt was so serious that she had to put back and repair. Her damages with the delay incident thereto will amount to about $10,000.

Fifth. Said collision was not due to any fault or negligence on the part of the Calderon, but was wholly due to the faults of those navigating the tug and the carfloats, which were lashed together as one vessel; in that they had no proper lookout, or no lookout properly stationed; did not exhibit the regulation lights; that after blowing one blast and receiving an assent thereto, they did not follow the course thus signalled, but changed their course without assent; and blew two blasts improperly. On the part of the tug in that it had no proper officer in charge or in a place to view approaching vessels, lacked the power to handle a tow so unwieldy, that it did not sooner stop and back and in having miscalculated the force and effect of the tide; and in other faults which will be shown on the trial thereof."

The testimony of each party supports, in a general way, its own allegations.

The colliding vessels were at first slightly to the starboard of each other but nearly head and head, in positions which in a straight channel would have required them to pass port to port. There is a sharp conflict as to the signals exchanged, the Transfer contending that there was originally a two signal agreement, while the Calderon urges that the first signal given and answered was one of one blast. The testimony shows that the contention of the Transfer should be sustained in this respect, notwithstanding more witnesses testified in

conformity with the Calderon's contention. The master of the tug W. A. Sherman, which was proceeding up the river ahead of the Transfer and on her port hand, was not interested. He testified that his attention was called to the matter by the Calderon blowing a signal of two blasts, which he at first thought was for him, although there was no occasion for signals, but just as he was about replying, he happened to turn around and saw the Transfer coming, so he concluded that the steamship was blowing to her and he then heard the Transfer answer. He said that the Transfer and Calderon were then in positions to pass clear of each other starboard to starboard. He said that the Sound steamer Plymouth came down the river and blew him a single blast, to which he replied with the same immediately, and the Transfer also subsequently blew a single blast to the Plymouth which she replied to.

It is evident that this last single blast was regarded by the Calderon as indicating a course for her to the right, whereupon she ported and attempted to pass the Transfer port to port. The Transfer starboarded at about the same time.

The consequence of the change towards the Battery brought the vessels into collision, notwithstanding an almost immediate change thereafter towards Governor's Island; the Calderon first striking the starboard float and then the port float. The consequence of the blows was that both floats were broken loose from the Transfer. The Calderon passed her port to port.

The Calderon urges that the one blast signal was the first one and that it was proper under the starboard hand rule, which required the Transfer to keep her course and speed while the Calderon should avoid her, which she was endeavoring to do by going astern, but it does not seem to be a case for the application of that rule. Whether the Transfer exhibited her green light to the Calderon is more than doubtful. All the witnesses from the Calderon say that she showed her red light, which seems probable from the courses of the vessels which were apparently crossing at an angle of about two points, the Calderon heading about west by north while the Transfer was heading about east by south, and I do not think that the positive testimony can be overcome by a suggestion that the Transfer must have been heading somewhat up the river in consequence of the effect of the ebb current in the North River. It seems to have been a case for the application of the Bend Rule. The Victory & The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519. The Transfer's course in rounding the Battery, would naturally have carried her to the northward and eastward of the Calderon, though the Transfer showed a red light, especially in view of the fact that such a course had been indicated and agreed upon by the exchange of the two blast signals.

Nor do I think that the Calderon can be excused from not following the original agreement by the fact of the single blast having been given to the Plymouth. The Sandy Hook pilot who was navigating the Calderon to sea, knew of the Plymouth following the Calderon down and should have known that she was the vessel to which the single blast was blown after the agreement of a two blast course be-

tween his vessel and the Transfer. He testified that there was no two blast agreement but it seems to me that there can be no reasonable doubt of that fact.

The Calderon got straightened down the river at 6:33 A. M. and the collision happened at 6:40 A. M. The distance travelled was about a mile which she covered in 7 minutes. At first she went slowly and it was after the expiration of a few minutes that her engines were put at full speed, which is said to have been 13 or 14 miles. She evidently acquired nearly that speed without delay and just before the collision must have been going at the rate of 10 or 12 miles in a part of the river where an excess of 8 miles is forbidden by the state statute. She was in fault in this respect.

The Calderon was also in fault for attempting to cross to the right in the face of an agreement to go to the left.

The Transfer was in fault for agreeing to go to the left and attempting to do so when her heading was such that a passing to the right might have been intended and which had the effect of making the Calderon believe that she was going to the right, especially in view of the one blast signal to the Plymouth, which the Calderon might easily and did believe was designed for her and to indicate such a passing.

Both were in fault for proceeding when it became evident that there was a misunderstanding and for persisting in their attempts until it was too late to avoid a disastrous collision. The Calderon should have seen that the Transfer was signalling to go to the left while exhibiting a red light and passing to the right was apparently a proper manoeuvre. The Transfer should have seen that there would be no probability of the Calderon attempting to go to the left while the Transfer was exhibiting a red light, under the circumstances. Both should have blown alarm signals and stopped and reversed much sooner than they did and should not have attempted to proceed until an agreement could be reached for a safe passing.

There will be a decree condemning both vessels, with orders of reference.