## THE HIGH BULL.
## THE AMBOY.
## THE ST. CHARLES.
### Nos. A17224, A17345.

District Court, E. D. New York.
March 15, 1946.

Hagen & Eidenbach, of New York City (Nelson J. Johnson, of New York City, of counsel), for Frank Seagrave.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for M. & J. Tracy, Inc.

Pyne & Lynch, of New York City (Warner Pyne, of New York City, of counsel), for the St. Charles.

Burlingham, Veeder, Clark & Hupper, of New York City (George R. Wagner, of New York City, of counsel), for Pennsylvania R. Co., the Amboy.

INCH, District Judge.

Each of the libellants in these two suits, tried together, owned barges which were damaged while being towed by the tug Amboy, owned by the Pennsylvania Railroad Company, while the tug St. Charles, owned by the Amboy Tow Boats, Inc., was the helper tug to the said tow. The basis for each of said suits is that these barges of libellants' were damaged by reason of a collision between these barges, while being towed, and a steel oil barge Socony 26 moored at the south end of the Cyanamid dock near and south of Tremley Point, New Jersey, on March 24, 1944, said collision being due to negligence by those in charge of the said tugs, Amboy and St. Charles.

It was conceded at the trial that libellants are entitled to a decree against either or both of the tugs. The controversy, therefore, is between the tugs.

The Amboy claims that the collision was due solely to the negligence of the helper tug St. Charles in carelessly pushing the tail of the tow towards the place of collision. The St. Charles claims the collision was due solely to the negligence of the captain of the Amboy who carelessly was proceeding so close to the place of collision, that when he tried to "whip" his tow away from the said moored oil barge Socony 26, he was unsuccessful.

On the morning of March 24, 1944, the tug Amboy bound for South Amboy, New Jersey, had nine light coal barges in tow on two hawsers, three in the first tier, three in the second tier, two in the third tier on the port side, and one in the fourth tier on the port side.

As the tug and tow passed West New Brighton, Staten Island, the tug St. Charles joined the tow as a helper tug, and as it passed under the B. & O. Railroad bridge in Arthur Kill the St. Charles was astern of one of the barges, in order to guide the tail of the tow safely past the bridge abutments. When the tow passed Grasselli, the St. Charles was alongside the port barge in the second tier. It was then observed by the crew of the Amboy that the tow was swinging to starboard, towards the Jersey shore, and that the St. Charles was working her engines.

Thereupon the captain of the Amboy signaled the St. Charles to come alongside the Amboy. The St. Charles complied and received orders from the captain of the Amboy to return to the port barge in the second tier, but not to work her engines as that was tending to push the tow to starboard. The St. Charles, as the tow was rounding Tremley Point, returned to the tow alongside the port barge in the second tier and proceeded to make fast to the barge, working her engines and pushing against the barge causing the tail of the tow to again swing to starboard with the result that the barges in question came into collision with the steel oil barge Socony 26, which was moored to the bulkhead at the south end of the American Cyanamid Company plant on the Jersey shore. The dock is about 600 feet long and lies a little south of Tremley Point. The Socony 26 was moored at the south end of the dock.

In order to determine from the testimony whether or not those in charge of these tugs were careless, it is necessary to consider the testimony as to what each of these tug captains did, if anything, which indicates such carelessness. Before doing this, however, a few general statements should be made.

The Amboy had two cables from her stern bitts to the outside corners of the

loaded coal barges in the first tier and there was about 125 feet between the Amboy's stern and the forward end of these boats. Each of these coal boats were approximately the same length and dimensions (about 100 feet long) so that it can readily be seen that the distance, from the tug Amboy to the tail of her tow, was approximately 600 feet. The starboard boat in the second tier, the Cape Reed, was 142 feet long somewhat longer than the other boats. Her deck was several feet higher and she lapped the two boats in the third tier. I see nothing, however, improper in the make up of the tow.

The wind blowing across the Jersey shore against the tow was approximately 20 miles an hour as the tow reached abreast of the town known as Grasselli, New Jersey. From Bedloes Island to West New Brighton, the Amboy had proceeded alone with her tow and it was about 9:20 A.M. when the tug St. Charles joined the tow. The accident did not occur until about 11 A.M. when the tow was off Tremley Point. The day was clear, the tide ebb and under foot.

There was nothing unusual about the speed of this tow. In my opinion, this speed was approximately four miles an hour. In addition, from Grasselli to Tremley Point, there was a bend in the stream to the port of a vessel going south past Grasselli towards Tremley Point, making it necessary for such a tug as the Amboy to watch out for any starboard swing as they approached Tremley Point. The wind, then blowing, was helpful in that connection as it had a tendency to keep the tow away from the Jersey shore. Nevertheless, it was incumbent on the captain of the Amboy to particularly bear in mind the danger of the tow in this somewhat narrow stream as to any swing to starboard as Tremley Point was approached and passed.

Bearing in mind these general observations which seems to me to be borne out by the consideration of the exhibits we now come to the actions of the captains of the tugs.

I am satisfied that the captain of the St. Charles lacked experience both as to signals and the duty of a helping tug. The captain of the Amboy was a much more experienced man, although that greater experience placed a duty, as to care, upon his shoulders. I am willing to take his assertion that a helping tug should never push against the wind.

Nevertheless, as the tow proceeded towards Tremley Point and was passing Grasselli, it was observed that the captain of the St. Charles, whose tug was alongside the port barge in the second tier, was working her engines and pushing the tow against the wind to swing somewhat towards the Jersey side, whereupon the captain of the Amboy signaled to the St. Charles to come alongside the Amboy for orders. This order was complied with by the captain of the St. Charles, although apparently he did not at first understand what the signals were about. Thereupon the captain of the Amboy told him to return to his place alongside the tow, but not to work his engines. Nevertheless, when the St. Charles did return to the tow, I am satisfied he deliberately disobeyed this order, the tow was about around Tremley Point at that time, very near the Cyanamid dock where the collision occurred.

Aside from what might possibly be called interested witnesses, I am impressed with the testimony of Gaffney, who was on one of the barges near the St. Charles and who seems to me to be disinterested, who testified that he was an eye witness of what was then being done by the captain of the St. Charles and he protested against it in very vigorous manner. This was shortly before the collision. This witness testified that he saw the St. Charles at that time "with her bow to the side of the boat pushing the boats towards the Jersey shore." The collision in question occurred very shortly thereafter.

In my opinion, considering all the testimony as to the action of the St. Charles, most of which, except that relating to the time just before the collision, does not seem to be much in dispute, that the captain of the St. Charles was plainly careless in not obeying the orders of the captain of the Amboy, and on the contrary, deliberately disobeyed such orders, and negligently caused the tail of the tow to approach so

close to the Jersey shore and the Socony 26 that several of the boats collided with such vessel. For such negligence the St. Charles and her owners are liable.

We now come to the action of the captain of the Amboy. This presents to me a more difficult question although I think the evidence is reasonably clear.

Counsel for the St. Charles argues that the testimony shows that the collision was due entirely to the negligence of the captain of the Amboy in approaching so close to the Jersey side and the Socony 26, that in an effort to "whip" his tow away he caused his tow to collide with that vessel.

While it is necessary for a towing tug to keep his tow in line, that depends upon the circumstances. What he must not do is to negligently allow his tow to get out of line. Captain of the Amboy testified that he would have kept his tow in line, had it not been for the negligence of the captain of the St. Charles.

Counsel for the Amboy states, in his brief, that because of the negligence of St. Charles this court should not be astute in finding fault on the part of the Amboy, citing, The Victory & The Plymothian 168 U.S. 410.

It seems to me, however, that it is reasonable, if it is supported by the evidence, to find that two tugs, such as the St. Charles and the towing tug Amboy, could both be negligent and that this combined negligence interweaved so as to produce the unfortunate result of the collision in question.

In the first place the captain of the Amboy was an experienced captain. He had had a license since 1928 and for twenty-four years he had been employed by the Pennsylvania Railroad Company, operating on this coal route between South Amboy and New York.

As the tow proceeded past Grasselli and was approaching Tremley Point, he had had trouble with the captain of the St. Charles who was pushing the tail of the tow towards the Jersey shore. The captain of the Amboy knew that the tow was approaching Tremley Point, and to make the turn around it, required careful navigation. As this turn was reached he had given specific orders to the somewhat incompetent captain of the St. Charles what to do. As the tow rounded Tremley Point, the captain of the Amboy could plainly see, and, from experience, was fully aware of, the presence of the Cyanamid dock shortly ahead.

Thus it seems to me that the captain of the Amboy would not be justified in placing too much confidence on the captain of the St. Charles and should take reasonable precaution against future carelessness on the latter's part.

According to Olson, deckhand on the Amboy, when the tow reached this Tremley Point, both the wind and the set of the tide, at that time, would tend to take the tow towards Staten Island away from the Jersey shore. Thus the captain of the Amboy, with the knowledge of the foregoing, did not need to round Tremley Point so close. He estimates the tow was only about 35 feet away from some barges at the end of Tremley Point. This may have been all right under other circumstances, but there was plenty of open water at that place, which, with the aid of the wind and the tide, would make it reasonably possible to go out further from the Jersey shore as the tow approached the Cyanamid dock, which was about 600 feet long, with the Socony 26 moored at the south end, and but a conparatively short distance ahead.

The St. Charles had returned to the tow about as the tow was rounding Tremley Point after her captain had been warned, as above, by the captain of the Amboy and again the St. Charles took up its position alongside the port second tier. Nevertheless, the captain of the Amboy having now passed Tremley Point so close, proceeded to pass the Cyanamid dock at a distance of what he estimates to be about 125 feet, although again there appears to have been ample water towards the Staten Island side.

As I have said, at the South end of this Cyanamid dock there was this obstruction caused by the presence of the moored Socony 26, which would seem to make the tow somewhat closer to the obstruction which must be passed. It was then that

the captain of the St. Charles repeated his careless action and was again warned by alarms from the Amboy. All of this time the tow was in motion. Nevertheless, this getting out of line by the tail of the tow was not sudden but gradual, according to the captain of the Amboy.

This brings us to the final and, in my opinion, the most important careless act by the captain of the Amboy. In view of his experience and opportunity to avoid the accident then existing, and in view of the record, we must pause for consideration of certain other matters before stating our conclusions.

It seems to be established by the cases, that when a tug towing barges goes to port, the tendency of the tail of that tow is to go to starboard. Thus if the Amboy went to port, in the direction of Staten Island, the tendency of her tow would be to go towards the Jersey shore. According to the captain of the Amboy, his tow had been straightened out after he passed Tremley Point. After it had traveled but a short distance the action of the St. Charles was observed, as they approached the Cyanamid dock, again pushing the tow towards Jersey.

On this critical question of the navigation of the Amboy just before the accident, the record presents a peculiar conflict as to what the captain of the Amboy then did. Captain McCabe of the Amboy testified that when he observed the action of the St. Charles, the tow was about 200 feet away from the Socony 26. That he then had started to go to port. "I pulled them gradually to get my tow there behind me. There was no rank sheer of the tow at all. After the tow started to sheer in then I hauled to port."

The result of this would be therefore to accentuate the very thing he was seeking to avoid, occasioned by the carelessness of the St. Charles. Apparently there was ample water at that time for the Amboy to have gone to starboard the result of which would have been to counteract this swing of the tail of the tow towards the Jersey shore.

I have no reason to doubt the testimony of Captain McCabe that he went to port instead of starboard, but, on the last day of the trial, when all witnesses had been examined except one who had not been available until that morning, Sheehan, the mate of the Amboy, was placed on the stand by the Amboy, very apparently without knowing what Captain McCabe and others had testified to. He stated he had been an eyewitness to what took place before the collision. It is a fair inference that he knew what was then the proper maneuver for the Amboy and was not aware of anything to prevent it. In my opinion he was mistaken as to what actually occurred. He states, in substance, that at the time of the accident, the Amboy and her tow were about off the Cyanamid dock, that "we tried our best to break it away, this push toward the dock. The captain put the bow of his tug to starboard, aimed it towards the Jersey shore to break the tail of the tow towards Staten Island."

This, according to Sheehan, was the necessary, possible, and proper navigation of the captain of the Amboy. Yet, according to all the other testimony, it did not take place. I agree with Sheehan that the circumstances reasonably allowed for such proper navigation by the tug Amboy, yet, I am compelled to find that the captain of the Amboy did the very opposite and, by this careless act, combined with the carelessness of the captain of the St. Charles, brought about the collision in question.

Accordingly, it is my opinion, that both the captain of the St. Charles and the captain of the Amboy were negligent and that such negligence combined to bring about the collision and damage to libellant's barges. Therefore each tug is liable to libellants to the full amount of the damages sustained and between the tugs, both being at fault, such damages must be shared and each is primarily liable for one-half of said damages. The Washington & The Gregory, 9 Wall. 513, 76 U. S. 513, 19 L.Ed. 787. See Section 416 page 490 Benedict on Admiralty 5th Ed.

Findings and the usual decree in such cases should be submitted.