**Wilton August MEYER, Plaintiff,**

v.

**T. J. McCARTHY STEAMSHIP COMPANY**

and

**Dunbar & Sullivan Dredging Company, Defendants.**

**Civ. A. No. 35539.**

United States District Court
N. D. Ohio, E. D.
March 15, 1960.

J. Harold Traverse, Paul Mancino, Cleveland, Ohio, for plaintiff.

Johnson, Branand & Jaeger, Cleveland, Ohio, Foster, Meadows & Ballard, Detroit, Mich., for defendant McCarthy Steamship Co.

Dwight B. Buss, Russell E. Leasure, Cleveland, Ohio, for defendant Dunbar & Sullivan Dredging Co.

McNAMEE, District Judge.

Plaintiff brought suit against his employer, T. J. McCarthy Steamship Company (McCarthy) and Dunbar & Sullivan Dredging Company (Dunbar) to recover damages for personal injuries sustained as a result of a collision between the Steamer Denmark, owned and operated by McCarthy, and the tug Sherman VI and dump scow 116, owned and operated by Dunbar. The collision occurred on May 20, 1958, at about 12:40 a. m., while the Denmark was proceeding up-

bound in the Middle Neebish Channel of the St. Mary's River, laden with a cargo of coal, and the tug and dump scow were proceeding downbound in said Channel. The tug was made fast to the starboard quarter of the scow, which was carrying waste material to the dumping ground. Defendants have agreed to settle the plaintiff's claim for $20,000, to be paid by either one or both defendants as may be determined by the Court upon evidence relevant to the issues raised by defendants' respective answers and amendments thereto which are to be considered as cross-libels in admiralty.

Dredging operations were commenced in the Middle Neebish Channel on or about May 1, 1958, and notice thereof, with a chart designating the dredging area, was issued to all mariners. The Master of the Denmark had received the notice and chart and the Captain of the tug was familiar with the area being dredged, which was located on the west side of the Channel and extended approximately ½ to ⅝ths of a mile in length. The dredging was continuing on the morning of May 20, 1958. The dredging area was closed to navigation, thus narrowing the navigable area of the Channel to a width of 190 feet. Above and below the restricted area the width of the Channel was about 500 feet. The northerly end of the restricted area was opposite buoy 3A. Johnsons Point is several hundred feet north of buoy 3A at a point where the Channel dog-legs to the northwest, and a Coast Guard Station is located a short distance northwest of the Point. When both the Middle Neebish Channel and the West Neebish Channel are available to traffic, vessels of over 100 tons gross must pass upbound through the Middle Channel and downbound through the West Channel. The Denmark is a vessel of 5,419 gross tons, the tug's gross tonnage is 69 and that of the scow 519 gross tons. The Denmark's beam is 56 feet. Lashed together as they were, the tug and scow had a combined beam of 53 feet.

Pursuant to 33 U.S.C.A. § 474, the Commandant of the Coast Guard adopted and prescribed the following regulation:

"When both the Middle Neebish Channel and the West Neebish Channel are available to traffic, vessels of 100 gross tons or over shall pass upbound through Middle Neebish Channel and downbound through West Neebish Channel. Vessels over the prescribed tonnage making regular local stops in either of those channels may run counter to the general traffic direction only on written permit issued by the captain of the port, for such term and under such conditions of revocation as he may prescribe. A vessel thus running counter to the general traffic shall keep off the channel range when an approaching vessel is on or entering that range." Title 33 CFR § 92.59

Shortly before midnight on May 19, 1958, the Coast Guard informed the Master of the tug that two vessels were approaching upbound toward the restricted area. The tug and scow remained outside and north of the restricted area and both upbound vessels passed through the restricted area of the Channel without incident. The Master of the tug also learned that a third vessel was approaching upbound and upon communicating with another Dunbar tug, the Spalpeen, he was informed that a third vessel, which was the Denmark, was then at Everens Point some distance south of the restricted area. The Captain of the tug, however, decided not to wait for the Denmark to pass and navigated his vessels downbound toward the restricted area of the Channel. He sounded a single whistle blast, to which the Denmark responded in kind, thus assenting to the port to port passing selected by the Captain of the tug. At about 12:33 a. m., as the Denmark drew close to the restricted area, she checked her speed to "Slow." In the forward part of the Denmark were the Captain, the Second Mate, the Wheelsman and the Watchman. The

first three of the above men testified that the Denmark pursued a steady course upbound with its starboard side about 20 feet from the buoys on the east side of the Channel and that as the vessel reached a point between buoy 3A and buoy 4 the tug and scow suddenly sheered to port directly into the path of the Denmark. The Watchman on the Denmark hollered "He is going to hit us." Thereupon the Denmark's Captain gave the command "Hard right," but the bow of the Denmark was struck by the port corner forward of the scow and again by the port corner aft of that vessel. The force of the first impact caused a hole in the forward part of the Denmark but the scow was undamaged. The Watchman of the Denmark did not testify but statements made by him were received in evidence without objection. These statements corroborated substantially the above testimony of the Captain and other members of the crew. The collision occurred about 12:40 a. m. About 12:38 a. m. the speed of the Denmark was accelerated.

█ The evidence discloses that the tug had permission from the Captain of the Port to run counter to the general traffic but such permission did not and could not supersede the express mandate of the statutory regulation which required a vessel moving counter to the general traffic to "keep off the channel range when an approaching vessel is on or entering that range." There is no question that the tug violated the regulation and that such violation was a navigational fault causing the collision. The issue remaining for determination is whether there was such contributory fault on the part of the Denmark as would warrant an apportionment of the damage.

█ █ The law places the burden of showing contributory fault of the Denmark upon Dunbar as the owner of the tug and scow and requires that such burden be sustained by clear and convincing evidence. The Oregon, 158 U.S. 186. 15 S.Ct. 804, 39 L.Ed. 943; The Victory, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519. In an effort to sustain this burden, Dunbar called as witnesses Captain Smith, who piloted the tug, Harold Schinke, the lookout at the Coast Guard Station, and Thomas Brander, a retired Coast Guardsman who at the time in question was employed as a dredge inspector. Captain Smith testified that he knew of the regulation requiring vessels running counter to the general traffic to keep off the range when an approaching vessel is on or entering the channel. He also stated that he was informed of the approach of the Denmark to the restricted area. Although he waited some distance above buoy 3A to permit two vessels to pass through, he evidently thought that he could pass safely downward before the Denmark reached the southerly part of the restricted area. That he was mistaken in this regard is evidenced by his statement that the Denmark was probably moving faster or was farther up the Channel than he expected at the time he gave the signal for the port to port passing. Captain Smith expressed the view that the Denmark was traveling about 8 miles an hour and the tug and scow about 5 miles per hour and that the steamer had proceeded about one mile while his vessels were moving downbound a distance of about 1500 feet. As will be shown hereinafter, these estimates were erroneous. He stated that as he reached the restricted area he passed within 6 feet of buoy 3A. He denied that the tug and scow sheered to port. However, he admitted that on the day following the collision he made a statement to the Coast Guard by way of explanation of the cause of the collision in which he stated: "The current might have caught her a little and set her down. I think he was giving us all he could." Captain Smith is a mariner of long experience, having been engaged in various phases of tug operation since 1932. He has served as a Captain for many years. He impressed the Court as a competent, alert officer, proud of his ability as a navigator, and it is highly improbable that he would have made the above quoted statements

if they did not indicate the circumstances of the collision. These statements were made while the circumstances were vivid in the memory of the witness, at a time when no litigation was pending, and are entitled to great weight. The statement that the current may have caught his vessel and set it down may be accepted as a reasonable explanation of the sudden movement of the scow to port but it constitutes no legal excuse for not preventing the collision with the steamer. The statement that "I think he was giving us all he could" implies that the Master of the Denmark was navigating his vessel in a proper manner.

■ Harold Schinke testified that from his lookout station it appeared that the Denmark was moving upbound with its bow in the center of the Channel and its port side west of the Channel. He stated also that the tug and scow appeared to pass close to the west side of the Channel. Schinke made his observations of the vessels from the Coast Guard Station which was 1500 feet north and west of the westerly side of the Channel. It was dark at the time of the collision and except for the lights on the vessels Schinke would not have been able to make any observations as to their respective positions. The day after the collision Schinke was interrogated by Lieutenant Sperry of the Coast Guard in respect of his knowledge of the collision. While Schinke denied making many of the statements appearing in the written transcript of the interview, I have no doubt that the following portion of the transcript is correct:

"Q. What was the general position of the Denmark as she was passing the dredging area, in regard to the easterly side of the Channel?

"A. She appeared to me from her lights to be closer to the west side of the Channel, she appeared to be west of the center of the Channel —it's hard to tell by lights." (Emphasis supplied.)

The difficulty of making accurate observations of the respective positions of the vessels from the Coast Guard Station was further enhanced by the presence of lights on the drill boat and other craft in the dredging area, the lights on the tug and the lights on the Denmark. This condition, together with the distance and angle from which Schinke made his observations, militates strongly against the probability that his testimony as to the respective positions of the vessels at or close to the time of the collision was accurate and reliable. Such testimony is of little or no probative value.

Thomas Brander testified that he was in the galley of the tug at the time he heard the whistle for the port to port passage. Immediately thereafter he came on deck on the port side forward of the tug. He testified he saw the Denmark at Everens Point and estimated that it was traveling about three times as fast as the tug and scow, which in his opinion traveled about 1,500 to 1,600 feet while the Denmark was traveling 4,500 to 4,800 feet. Upon cross-examination, however, Brander conceded that the maximum speed of which the Denmark was capable while traveling against the current could not exceed 8 miles per hour and that the Steamer could not have been moving three times as fast as the tug and scow. He also conceded that the Denmark must have been close to the restricted area of the Channel when he first observed it instead of being at Everens Point as he stated in direct examination. These concessions tend also to refute Captain Smith's testimony relative to the speed at which the vessels were traveling and the position of the Denmark at the time the whistle was sounded by the tug. Brander's testimony relative to the positions of the vessels in the Channel was that the tug and scow passed within 6 feet of buoy 3A and that the Denmark was coming "right up the middle"—"heading right for us" and that he "thought the Denmark was going to hit us head on." Brander was a disinterested witness and obviously attempting to relate the facts truthfully. Unlike Schinke, he was in a

position to make accurate observations as to the course of the Denmark. His testimony as to the apparent imminence of a collision between the upbound and downbound vessels is consistent with the testimony of the Captain and crew of the Denmark in relation to the same subject matter. However, Brander's impression that the dangerous situation was created by the improper navigation of the Denmark is contrary to the testimony of the Captain and crew of the Denmark and varies significantly from the testimony of Captain Smith and his statement to the Coast Guard. Captain Smith was stationed in the pilot house of the tug from which point of vantage his view of the course pursued by the Denmark was as good if not better than that of Brander. Yet when Captain Smith was asked to state the position of the Denmark in the Channel he evaded a direct answer and said he was "too busy" to observe the position of the upbound vessel. Undoubtedly Captain Smith was a busy man. He was engaged in the difficult task of piloting a tug of 69 gross tons lashed on its port side to a larger and heavier scow of 519 tons with both vessels moving in a current running 3 miles per hour. The record fails to disclose the presence of any crewmen on board either vessel and apparently Captain Smith was piloting the vessels without assistance. But, busy as he was, Captain Smith could not have failed to observe the course of the well-lighted Denmark if that vessel was proceeding "up the middle" directly into the path of the tug and scow.

The above circumstances compel the inference that if the Denmark was pursuing the course described by Brander, Captain Smith would have been fully aware of that fact and would have so testified.

In evaluating Brander's testimony it is unnecessary to compare it with the countervailing testimony of the Captain and crew of the Denmark. Captain Smith's testimony alone is sufficient to weaken if not destroy Brander's testimony relative to the course of the Denmark as it proceeded upbound in the Channel. The testimony of the Captain and crew of the Denmark that she was pursuing a steady course on the starboard side of the Channel a distance of 20 feet from the east bank is supported by the fact that pursuant to the Captain's order the Denmark accelerated her speed just two minutes before the impact between the vessels. It is inconceivable that such an order would have been given if at that time the Denmark did not have clear sailing ahead. Moreover, the absence of any danger signal tends to confirm the view that the collision resulted from a sudden and unexpected occurrence.

In view of the foregoing, I am persuaded that while Brander's apprehension of a head-on collision was justified, he was nevertheless mistaken in his impression that the Denmark was pursuing a course on the wrong side of the Channel directly into the path of the tug and scow.

█ Dunbar has failed to show by the requisite degree of proof that the collision was caused in part by the contributory fault of the Denmark. By reason of the violation of the regulation governing navigation in the Middle Neebish Channel the tug and scow were in a position analogous to that of a motorist traveling in the wrong direction on a one way street. In addition, the failure of the Captain of the tug to prevent the tug and scow from sheering to port contributed proximately to cause the collision. As said by Mr. Justice Lurton in The F. W. Wheeler, 6 Cir., 78 F. 824, 832:

"That sheer was the proximate cause of this collision. Such a sudden and improper change of course was a very plain violation of the rules of navigation * * *."

I hold, therefore, that the collision and the resultant injuries to plaintiff was caused solely and proximately by the navigational faults of the tug and scow.

This Memorandum constitutes Findings of Fact and Conclusions of Law

pursuant to Rule 52(a) F.R.Civ.P., 28 U.S.C.A.

An order may be prepared in accordance with the foregoing.